THE HONORABLE BRIAN A. TSUCHIDA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| OBERTO SAUSAGE COMPANY, | No. C10 - 02033 |
| Plaintiff, | DECLARATION OF THOMAS C. ENNIS |
| v. | |
| JBS S.A., | |
| Defendant. | |

THOMAS C. ENNIS declares:

1.      I have been President of Oberto Sausage Company ("Oberto") since June 2009; prior to being appointed President, I served as Vice President of Marketing for Oberto for two years.  Prior to joining Oberto, I worked for Unilever, Dial and Brinker International, where I managed and successfully led numerous branded consumer products, including Lipton Tea, Ragu Pasta Sauce and Dial Soap.  I have personal knowledge of the matters set forth in this declaration and am otherwise competent to testify to them.

2.      Oberto is a family owned business, founded in Seattle in 1918 by Constantino Oberto.  Oberto is one of the oldest continuous manufacturers of natural-style jerky in the country.  Since its founding by Constantino, successive generations of the Oberto family have continued to grow the business, and today it has become a nationally recognized and renowned

DECLARATION OF THOMAS C. ENNIS
(NO. C10 - 02033) – 1

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

26097-0011/LEGAL19814360.2

provider of jerky snacks within the United States and around the world. It is the nation's second largest beef jerky brand and is third in the entire meat snack market. At its peak, Oberto had eleven percent of the jerky market. At present, it has about four percent of that market, per Nielsen's syndicated meat snacks data base. As I will discuss in more detail below, while Oberto is in the number two position, it faces fierce competition from the largest jerky producer in the United States – Link Jerky, Inc. ("Link") – who sells under the "Jack Link's Beef Jerky", "World Kitchens Beef Jerky" and "Matador Beef Jerky" brand names, with a combined share of 64% of the jerky market per Nielsen's syndicated meat snacks data base. Link also has a majority of the private label jerky business. Nielsen's syndicated data only captures a portion of the overall market. It does not include many large retailers such as Wal*Mart, Sam's Club and Costco, or certain other retail channels where jerky is sold such as sporting goods store, hardware stores, etc. Link currently has the vast majority of Wal*Mart business and the majority of the Sam's business, while Oberto has the majority of the Costco business. Taken all together, Link has a dominating share position with an estimated total dollar share of 67%, while Oberto, the next closest competitor has an estimated share of 9%.

3.      Much of Oberto's success can be attributed to its devotion to constant improvement of its product and manufacturing processes. Oberto spends significant resources in research and development each year to identify and develop new products, enhance its recipes and to develop innovative and efficient methods of manufacture to supplement its incredible wealth of experience.

4.      In 1999, Oberto entered into a long-term distribution agreement with Frito-Lay, which agreement gave Frito-Lay exclusive distribution rights subject to a few exceptions. This arrangement was successful for many years, and led to significant growth for Oberto.

5.      However, Frito-Lay's efforts on Oberto's behalf, and in turn Oberto's success in the market, began to drop off. Oberto's sales stagnated between 2004 and 2006, and began to decline rather precipitously in 2007 and 2008. Ultimately, in March 2009, Oberto gave notice to

DECLARATION OF THOMAS C. ENNIS
(NO. C10 - 02033) – 2

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Frito-Lay regarding Frito-Lay's breach and failure to meet its commitments to Oberto. The parties negotiated a resolution of this dispute in May 2009, whereby the parties jointly agreed to the termination of their distribution agreement effective on August 15, 2009. On May 27, 2009, Frito-Lay and Oberto together issued a press release announcing this joint decision to terminate the distribution agreement.

6.      Under the Manufacturing Agreement between Oberto and Bertin Ltda. ("Bertin"), which is at issue in this action, Bertin also benefited initially and then was hurt by Frito-Lay's success and then failure. This connection was recognized in the Manufacturing Agreement, in that the minimum purchase requirements in the Manufacturing Agreement were conditioned on a certain level of performance by Frito-Lay. In turn, however, once the contract with Frito-Lay was terminated due to Frito-Lay's diminishing performance and inability to meet minimum sales requirements, Oberto no longer had an obligation to purchase any particular amount of product from Bertin.

7.      A true and correct copy of the Manufacturing Agreement is attached hereto as Exhibit A.

8.      Oberto remained committed to its relationship with Bertin following the end of the Frito-Lay contract. Oberto continued to order what otherwise was stated as the minimum in its contract with Bertin through the end of 2009. This was difficult for Oberto, however, as it essentially had to hold this product in inventory as Oberto had suffered a significant loss of market due to the loss of Frito-Lay's distribution channels.

9.      On October 12 2009, I and Dennis Delaye, Rich Coker, Bruce Firnhaber and Alain Souligny from Oberto met with Evandro Messi (a contact at Bertin), Perdro Bertin (director of R&D for Bertin), Celso Armando (Bertin's plant manager) and Rick Smaligo (of Sampco, which I understand had been responsible for initiating our contractual relationship with Bertin, and since had been purchased by Bertin ) at a trade show in Germany to discuss the Oberto-Bertin relationship, and Oberto's anticipated market plans without Frito-Lay. Oberto

DECLARATION OF THOMAS C. ENNIS
(NO. C10 - 02033) – 3

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

informed Bertin that its purchases would be lean while it implemented those marketing plans, but that it had expectations for improved performance in the market. (That effort has, in fact, been successful and sales are now increasing significantly.) Bertin indicated that it understood the problems with Frito-Lay and agreed with the approach which would provide both parties with greater opportunities in the long run, despite an expected interim decline.

10.     Just a few weeks before these meetings in Germany, JBS S.A. ("JBS") announced that it was acquiring Bertin, and that the transaction would be closed upon the approval of the appropriate regulatory authorities in both the United States and Brazil. JBS is one of the world's largest "protein" companies. Prior to 2009, however, JBS had only had one – relatively unsuccessful – foray into the jerky market. In 2007, JBS joined forces with Jay Link, the disenfranchised son of the founder of Link, to produce Pioneer Brand Beef Jerky, at least initially using JBS supplied beef processed at JBS' plant in Santo Antonio, Brazil. Pioneer never achieved more than a minor share of the market.

11.     Naturally, at the Germany meetings, Oberto and Bertin discussed the announced JBS acquisition of Bertin. The Bertin representatives assured us that the merger would not impact the relationship with Oberto; that the Bertin business would not change under JBS.

12.     Bertin asked to come out to Washington in November 2009 to meet with Oberto again. At these November meetings, Bertin was once again represented by Pedro Bertin, Rick Smaligo, Celso Armando, and Evandro Messi. Oberto again was represented by myself, Dennis Delaye, Rich Coker, Bruce Firnhaber and Alain Souligny at these meetings. At this time, Bertin advised Oberto that it had obtained United States approval for the merger but that it was still awaiting Brazilian approval which it expected to receive soon. Bertin reiterated that it would continue to work with Oberto, and that Evandro Messi would continue to be responsible for the relationship.

13.     During these November 2009 meetings, Bertin asked if the contract with Oberto could be amended, as Bertin wished to sell other products from its plant because of Oberto's

DECLARATION OF THOMAS C. ENNIS
(NO. C10 - 02033) – 4

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

reduced orders.  I responded that I would be open to some modification to this agreement, but emphatically stated that Oberto would not agree to an amendment that would allow Bertin to sell to or work with a competitor (I mentioned Link specifically) or start a new jerky brand to sell in the United States in competition with Oberto.

14.     The merger of Bertin into JBS closed at the end of December 2009.  Contrary to his prior assurances to me, we learned that Evandro Messi was terminated by JBS as part of or immediately after the close.

15.     On January 10, 2010, I had a meeting with Jose Augusto de Carvalho Junior the CEO of Jerky Snack Brands, Inc., a subsidiary of JBS S.A.  Mr. Augusto informed me that, with JBS' acquisition of Bertin, he was now in charge of meat snacks for JBS, and he would be Oberto's direct contact.  He indicated that he had reviewed the business and that JBS wished to work with Oberto, but he indicated that the terms of the relationship needed to change.  For one, he advised that JBS wanted increased prices from Oberto than was it was then entitled under the Manufacturing Agreement.

16.     Mr. Augusto and I discussed the Manufacturing Agreement.  He acknowledged the contract, and he appeared to recognize that JBS had assumed Bertin's prior responsibilities under the contract.  However, he stated that JBS was interested in terminating the Manufacturing Agreement.  He asked, "Can we throw the contract away?", and also whether the parties could just "get rid of it?"  This was presented in the guise of it being a "new day" in the relationship and a way for the parties to make a fresh start.  I refused to "throw" the contract away, but indicated, as I had previously with Bertin, that Oberto would be willing to consider modifications.  I inquired how he would like the deal altered.  He did not want to discuss particulars of the contract.  Instead, he repeated that the parties should just throw the contract away, make a handshake agreement, and JBS would supply whatever Oberto needed.  This was not acceptable to Oberto.

DECLARATION OF THOMAS C. ENNIS
(NO. C10 - 02033) – 5

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

26097-0011/LEGAL19814360.2

17.     During the next few months, Oberto and JBS discussed various potential arrangements, including a potential joint venture between JBS and Oberto. Ultimately, at a meeting on April 6, 2010, JBS offered to buy Oberto. No specific dollar amount was discussed. I asked whether JBS would be interested in buying a minority position. Wesley Batista (one of the owners of JBS and an officer of JBS USA) stated that JBS wanted complete control of Oberto.

18.     While Oberto was considering JBS' inquiry about purchasing Oberto, Mr. Augusto on behalf of JBS SA, abruptly sent Oberto a letter dated April 30, 2010, notifying of JBS' termination of the Manufacturing Agreement, based on alleged breach by Oberto of the contract. A true and correct copy of this letter is attached as Exhibit B. Neither JBS, nor Bertin before the merger, had ever sent Oberto, as required under the Manufacturing Agreement, a notice of the claimed Oberto breach to allow for cure as specified in the Manufacturing Agreement. And Oberto continued to be placing orders under the Manufacturing Agreement, including a significant order placed on May 3, 2010, and, thus, was acting in good faith to cure any alleged deficiency in orders.

19.     On behalf of Oberto, I promptly sent a letter to JBS, dated May 10, 2010, disputing JBS' position, including that JBS had the right to terminate the Manufacturing Agreement. A series of written and verbal communications between the parties ensued. In those communications, I informed Mr. Augusto that Oberto had no minimum purchase obligations under the Agreement because Oberto was no longer receiving orders from Frito-Lay. (Oberto has not received any orders from Frito-Lay since August of 2009.)

20.     During these communications, Oberto repeatedly reminded JBS of its non-compete obligations under the Manufacturing Agreement, which extend five years after termination of that contract. JBS informed Oberto that it did not intend to honor those obligations. Finally, during a telephone call on June 15, 2010, Mr. Augusto told me that he was

DECLARATION OF THOMAS C. ENNIS
(NO. C10 - 02033) – 6

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

not willing to discuss the contract any further as, in JBS' view, the contract "does not exist" any longer.

21.     While we were very concerned about JBS' stance with respect to its non-compete obligations, initially JBS did not have any significant channel for selling jerky in the United States and we understood that its relationship with Jay Link was dissolving and that it was not manufacturing jerky in the Santo Antonio facility.  Moreover, in May 2010, an import ban from Brazil to the United States was imposed, and still is in effect, that covered any potentially competing product from JBS' plants in Brazil.  As such, over the next month or so, we made some further inquiries regarding a potential resolution but JBS did not respond.

22.     Our concerns were greatly increased, however, when On September 13, 2010, JBS announced that it had plans to enter into a joint venture with Link – Oberto's largest United States competitor – to manufacture product for Link at its two Brazilian plants (the Bertin one and the one that it used to make the Pioneer Jerky that it sold with Jay Link's business).  JBS' press release announcing this joint venture stated:

> JBS S.A. announced that it has reached an agreement with Jack Link's Beef Jerky whereby the largest beef producer in the world is uniting with the no.1 US meat snack brand to form a Joint Venture (JV) to operate two meat snack facilities owned by JBS in Brazil/
>
> The Brazilian facilities are located in San Antonio de Posse and Lins, in the state of Sao Paulo, and carry state of the art equipment to produce meat snacks specific to the needs of consumers worldwide.
>
> Under the agreement, JBS will supply the raw material at market prices and jointly operate the facilities in Santo Antonio de Posse and Lins with Jack Link's.  JBS will then sell the semi-manufactured product to Jack Link's for further processing, packaging and distribution in the United States and elsewhere. Proceeds from the JV will be split 50/50.  The JV is expected to begin operations before the end of this year.
>
> "We are forming an ideal partnership in bringing together the largest beef producer with the no.1 meat snack team to grow this business at a time when consumers are turning more and more toward healthy protein concentrated snacks," Wesley Batista,

DECLARATION OF THOMAS C. ENNIS
(NO. C10 - 02033) – 7

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:. 206.359.8000
Fax:  206.359.9000

president and CEO of JBS USA commented. "With our competitive production skills and with Jack Link's meat snack expertise and brand strength, this JV will enhance business for both of us and grow the market for this healthy product," Batista added.

In addition to the JV, JBS also announced that it has reached an agreement with the same Jack Link's Beef Jerky group to sell its US-based meat snack plant in Mankato, Minnesota, for an undisclosed sum. This transaction is due to close by the end of this month and is subject to customary closing conditions.

"Partnering with JBS in Brazil enables us to be the best, jointly, at what we do, and the addition of the Mankato plant gives us the opportunity to expand on our existing production operations and enhance our ability to meet our customers' needs," said Jack Link, CEO and chairman of the board, Jack Link's Beef Jerky. "Essentially, this is a perfect match and we are very enthusiastic about its potential."

A true and correct copy of this press release is attached hereto as Exhibit C.

23. JBS' plans pursuant to its joint venture announcement with Link are in blatant disregard of the non-compete provisions in the Manufacturing Agreement and demonstrate that JBS' intended competition in violation of its non-compete will cause significant harm to Oberto. Consequently, Oberto elected to escalate its discussions with JBS to the formal dispute resolution processes in that Agreement and provided such notice on September 15, 2010. The formal dispute resolution procedures required a meeting of principals followed by mediation and then arbitration. In view of the earlier negotiations, Oberto proposed to proceed directly to mediation but JBS declined.

24. Pursuant to the dispute resolution procedures, the parties held an in-person meeting of principals on November 10, 2010. As no resolution was reached through that process, the parties have moved on to mediation, and are in the process of trying to get a mediation scheduled soon. At present, however, it appears that the mediation may not occur until March of 2011, if not later. If mediation is not successful, Oberto intends to make an arbitration claim.

DECLARATION OF THOMAS C. ENNIS
(NO. C10 - 02033) – 8

26097-0011/LEGAL19814360.2

25.     As mentioned above, Link is the largest player in the beef jerky market, and it is growing quickly.  Link, which began operations in the mid-1980s, manufactures and sells Jack Link's Beef Jerky.  And, in 2009, Link entered into an arrangement with Frito-Lay to develop and market Matador Beef Jerky.  Jack Link's Beef Jerky (56 percent) and Matador Beef Jerky (8 percent) together are approximately 64 percent of the jerky market at present, as measured by Nielsen's syndicated meat snacks data base.

26.     Also as previously mentioned, JBS' only prior foray into the meat snack market, was with Jay Link.  In 2005, the founder of Link, Jack Link, had a falling out with his son, Jay Link.  This resulted in a number of bitter lawsuits between Link, Jack Link and his other son Troy Link, on the one hand, and Jay Link, on the other hand, which litigation continues to this day.  After he left Link, Jay Link joined forces with defendant JBS in 2007 (after JBS acquired Swift Foods and formed JBS US) to form a venture called Beef Snacks International and Jerky Snack Brands (formerly Pioneer Snacks), through which they manufactured and sold Pioneer Brand Beef Jerky.  However, as previously discussed, this venture was wholly unsuccessful.  In contrast, Oberto was able to develop a quality competitive product in the Bertin facility.  Further, it is our understanding that the Bertin facility (both prior to and after the planned efficiency enhancements planned by Oberto/Bertin) was more efficient at expected volumes.

27.     JBS poses a significant threat to Oberto, especially if acting jointly with Link.  It is exactly this type of competitive threat that the Manufacturing Agreement's non-compete provisions are designed to protect Oberto against.

28.     Prior to merging with Bertin, JBS was free to manufacture meat snack products and import them to the United States.  JBS, in fact, attempted unsuccessfully to do this with Jay Link using its Santo Antonio plant.  Prior to assuming the duties and obligations in the Manufacturing Agreement, moreover, JBS too was free to join forces with Link in competition with Oberto.

DECLARATION OF THOMAS C. ENNIS
(NO. C10 - 02033) – 9

26097-0011/LEGAL19814360.2

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

29.     JBS elected a different route to competition, however.  One that rides on the knowledge, skill and experience of Oberto and, violates Oberto's express contractual rights.

30.     JBS' actions are doubly harmful to Oberto.  First, Oberto needs a robust (and cost competitive) supply of beef for its products.  Having terminated – improperly – the Manufacturing Agreement, JBS has eliminated Oberto's existing supply in Brazil.  This forces Oberto to seek an alternative source of supply of beef in Brazil and develop a plant there to manufacture the product to Oberto's specifications for import.  As demonstrated by how long it took to develop and perfect the Bertin plant operations, this could take several years.

31.     At the very same time, JBS intends to use its plants in Brazil to provide competitive supply.  This means that at the same time that Oberto is disadvantaged by not having as much capacity as it expected under the Manufacturing Agreement, JBS is turning around and using that capacity against Oberto and advantaging its direct competitor:  One that as a direct result of the breach will not be required to undertake the time consuming, resource intensive work to develop a Brazilian source and establish supply.

32.     And, on top of all this, JBS is using the proprietary information that Oberto shared with Bertin over the last decade, including the more recent efforts to make the Bertin facility and processes more efficient, to accomplish this harm to Oberto.  Not only has JBS, therefore, directly benefited from access to Oberto's knowledge and skill in manufacturing meat snack products, but it is also causing Oberto harm by controlling available capacity from its plants to Oberto's detriment and assisting a direct competitor to more efficiently compete.

33.     The ban on exports from Brazil continues and thus the purported JV would not appear to be presently in operation.  We believe that the border will open soon, however, and it is important that Oberto obtain an injunction preventing processing and export at JBS' Brazilian facilities or it will suffer irreparable harm in the form of the violation of its non-compete and

DECLARATION OF THOMAS C. ENNIS
(NO. C10 - 02033) – 10

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

disclosure and use of confidential information to and on behalf of not only a direct competitor but the largest jerky producer in the United States.

**I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.**

EXECUTED this 20th day of December, 2010.

_____
Thomas C. Ennis

DECLARATION OF THOMAS C. ENNIS
(NO. C10 - 02033) – 11

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# EXHIBIT A

## MANUFACTURING AGREEMENT

AGREEMENT made as of this 30ᵗʰ day of October, 2001 by and between Oberto Sausage Company, a Washington corporation with its principal offices at 7060 South 238th Street, Kent, Washington 98035 (hereinafter called "Oberto"), and Bertin Ltda., a Brazilian "sociedade por cotas de responsabilidade limitada" (entity similar but not identical to a limited liability company), with its principal offices at Parque Industrial - Caixa Postal 350 - 164004-11 - Lins, SP, Brazil (hereinafter called "Manufacturer").

### WITNESSETH:

WHEREAS, Oberto is engaged in the business of manufacturing, distributing, marketing and selling meat snack products under various trademarks through various channels of trade, including independent distributors and direct retailers throughout the United States;

WHEREAS, Manufacturer is engaged in the business of manufacturing meat products throughout Brazil and shipping meat products internationally; and

WHEREAS, Oberto desires to have Manufacturer manufacture certain Oberto products in the Territory, and Manufacturer desires to so manufacture such products on the terms and conditions set forth in this Agreement;

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein and other valuable consideration, receipt and sufficiency of which is hereby acknowledged, Oberto and Manufacturer agree as follows:

1.    EXCLUSIVE MANUFACTURER IN THE TERRITORY

    a.    Appointment

        (i)    During the term of this Agreement, Oberto appoints and agrees to utilize Manufacturer as its exclusive manufacturer of "Products" in the Territory. Additionally, Oberto agrees to offer Manufacturer the right of first opportunity for manufacturing of "Products" contemplated to be produced outside the Territory in the geographic area of South America. As used in this Agreement, the term "Products" shall mean all meat snack products now or hereafter produced for Oberto and any "natural style jerky" (in current parlance), now or hereafter produced for Oberto by Manufacturer and marketed under any trademark or tradename. As used in this Agreement, the term "meat snack products" means any food product that (1) contains meat and



Obe001 002 cj263902 10/27/01

Decl. of T. Ennis - 13

(2) is sold as a snack. Notwithstanding any other provision of this Agreement, Oberto retains the right to manufacture the Products outside the Territory and to utilize others to manufacture the Products for Oberto outside the Territory. Nothing in this Agreement shall be construed so as to grant or authorize Manufacturer to sell, market or distribute the Products either inside or outside of the Territory. All rights to manufacture the Products outside the Territory are not included within this Agreement and are expressly retained by Oberto.

(ii)     Manufacturer accepts the appointment described above and agrees not to manufacture, sell or distribute natural style jerky or meat snack products without the express written consent of Oberto which consent may be granted or withheld in Oberto's sole discretion. Except as set forth in this Agreement, Manufacturer agrees not to manufacture, sell or distribute, inside or outside of the Territory, "natural style jerky" (in current parlance) and any other meat snack products while the same are included in the Products. Manufacturer further agrees not to provide meat in its raw or cooked state to any individual or company inside or outside the Territory producing similar "natural style Jerky" or meat snack products. Nothing in this paragraph (1)(a)(ii) shall limit or restrict Manufacturer's right otherwise to manufacture, sell or distribute cooked frozen beef products.

(iii)    The exclusivity established in items (i) and (ii) of this Clause does not and shall not in any manner whatsoever, be construed as creating any sort of association, consortium or similar relationship between Manufacturer and Oberto, nor as creating the obligation of entering into any such relationship.

b.    Delivery

The quantities of Products ordered by Oberto to Manufacturer under this Agreement shall be delivered to Oberto in a CIF basis (Incoterms 2000) at Oberto's Kent, Washington USA warehouse (or such other location as Oberto may designate) no later than thirty days days following the placement of Oberto's order.

Manufacturer shall at all times comply with Brazilian export procedures, specially those related to shipping, insurance, registry before Brazilian customs, including but not limited to, the relevant



procedures before "Secretaria de Comércio Exterior", "SISCOMEX - Sistema Integrado de Comércio Exterior" and Brazilian Tax Authorities.

Manufacturer agrees to utilize Sampco with its principal offices located at 221 N. LaSalle St. Suite 900, Chicago, Illinois, as the importer and will be responsible for all costs associated with the use of Sampco services and expertise. Sampco will be utilized by Manufacturer until such time it is determined by mutual agreement between Sampco and Manufacturer that Sampco no longer provides value added services to the Manufacturing Agreement. Oberto shall have no obligations or liabilities with respect to Sampco. Manufacturer agrees that any up charges or changes in Sampco's commissions shall not be the basis for any change in Manufacturer's prices for the Products.

c.    Territory

The term "Territory" as used herein shall mean the geographic area of the country of Brazil.

2.    TERM

a.    Initial Term

Unless terminated sooner in accordance with the terms and conditions of this Agreement, this Agreement shall have a term of five (5) years ("Initial Term"), commencing on the date of execution by the parties ("Execution Date").

b.    Renewal Term

At the end of the Initial Term, this Agreement shall be renewed automatically in incremental terms of five (5) years each ("Renewal Term"), provided that either party may terminate this Agreement at the conclusion of the Initial Term or any subsequent Renewal Term by providing the other with not less than one (1) year's prior written notice of intent not to renew. References in this Agreement to "Term" shall include the initial Term and any Renewal Term(s) unless expressly provided otherwise.

c.    Mutual Assurances Respecting Termination

Upon expiration or termination of this Agreement, Manufacturer and Oberto shall cooperate and proceed in good faith, and take such



Decl. of T. Ennis - 15

commercially reasonable measures as may be appropriate, to facilitate the efficient and orderly transfer of manufacturing of the Products by Oberto and Manufacturer without undue cost, inconvenience or interruption to the sales or business of either party, and as otherwise reasonably necessary or appropriate to give effect to the intentions of the parties in accordance with the terms and conditions of this Agreement.

3.    MANUFACTURER PERFORMANCE

a.    Production Capacity

During the term of this Agreement, Manufacturer agrees to dedicate and maintain at all times production capacity adequate to supply finished Products to Oberto, according to the following requirements:

(i)     On November 1, 2001, Manufacturer shall be able to supply Oberto not less than fifteen thousand (15,000) pounds of Product per week. Oberto shall specify actual Products ordered in accordance with Clause 4.a. to this Agreement, all such Product shall be shipped by method specified by Oberto not less than two weeks after removal from the cooking cycle. Oberto will provide Manufacturer with a firm order quantity by September 1, 2001;

(ii)    Beginning January 1, 2002, or such later date as Oberto may designate and continuing each week thereafter until April 1, 2002, Manufacturer shall be able to supply Oberto not less than fifty thousand (50,000) pounds of Product per week. Oberto shall specify actual Products ordered in accordance with Clause 4.a. to this Agreement, all such Product shall be shipped by method specified by Oberto not more than 1 week after removal from the cooking cycle;

(iii)   Beginning April 1, 2002, or such later date as Oberto may designate and continuing each week thereafter until July 1, 2002, Manufacturer shall be able to supply Oberto not less than seventy five thousand (75,000) pounds of Product per week. Oberto shall specify actual Products ordered in accordance with Clause 4.a. to this Agreement, all such Product shall be shipped by method specified by Oberto not more than 1 week after removal from the cooking cycle;

(iv)    Beginning July 1, 2002, or such later date as Oberto may designate and continuing each week thereafter for the remainder of the Initial Term and any Renewal Terms, Manufacturer shall be able to supply Oberto not less than one hundred thousand (100,000) pounds of Product per week. Oberto shall specify actual Products ordered in accordance with Clause 4.a. to this Agreement, all such Product shall be shipped by method specified by Oberto not more than 1 week after removal from the cooking cycle; and

(v)     Beginning January 1, 2003 or such later date as Oberto may designate and continuing each week thereafter for the remainder of the initial Term and any Renewal Terms, Manufacturer with six (6) months notice by Oberto shall be able to supply Oberto not less than one hundred twenty five thousand pounds (125,000) of Product per week. Oberto shall specify actual Products ordered in accordance with Clause 4.a. to this Agreement, all such Product shall be shipped by method specified by Oberto not more than 1 week after removal from the cooking cycle.

The parties expressly agree that, except as set forth in Section 5 below, nothing herein shall be construed or applied to impose upon Oberto any duty to order or purchase any or all of the Products. Manufacturer and Oberto shall cooperate to satisfy Oberto requirements in excess of the quantities specified at (i), (ii), (iii), (iv) and (v) above, including, but not limited to, prioritization of production among individual Products, and extending order times.

b.      Product Quality

(i)     With respect to the manufacturing of the Products, Manufacturer agrees to maintain at all times the highest commercially reasonable standards of quality as defined by Oberto. This includes 100% visually lean meat found in the top round, eye of round, flat and insides or, if requested by Manufacturer, other raw material which Oberto must approve in advance. All Products shall be prepared to precise specifications utilizing recipes, spices and cook cycle times provided by Oberto from time to time.

c.      USDA Inspection

(i)     Manufacturer will maintain the status as a USDA inspected facility and will complete HACCP plans for the Products.



Manufacturer shall notify Oberto immediately of any product audits which indicate the presence of listeria monocytogenes, salmonella, E. Coli 0157H7 or other pathogenic organism in any of the Products during the Term of this Agreement. Manufacturer shall also inform Oberto immediately of any inquiry, investigation, or non-routine inspection made by any federal, state, or local governmental agency concerning any facility used by or for Manufacturer to manufacture or store any of the Products, and shall provide Oberto with a copy of any reports related thereto. Manufacturer will provide Oberto with a copy of any corrective action planned or taken in connection with or relating to the USDA audit, product audit or any governmental inquiry, investigation or non-routine inspection. Oberto may reject any Product from the same lot or source as Product found to contain such pathogenic organism, or any Product manufactured or stored using any facility failing to satisfy applicable USDA standards or any regulatory standards, as well as any Products incorporating any materials produced or manufactured using any such facility. Manufacturer shall bear the expense of any remedial or other activities indicated hereby. Oberto shall be under no obligation to perform or cause to be performed such audits or inspections and Oberto's inspection or failure to inspect the Products or Manufacturers facilities used to process, store or distribute the Products shall not affect or release Manufacturer from any of its obligations under this Agreement. None of the obligations of Manufacturer with respect to the Products shall be affected or released by Oberto's acceptance of delivery or payment for the Products or by performance of any inspection or audit or acceptance by Oberto of any resulting report.

(ii)     Manufacturer shall make available to Oberto by September 1, 2001 written reports of USDA inspection/audits for each of its facilities used in or relating to the manufacture or storage of any of the Products, showing such inspections to have been performed following the Execution Date, and the subject facilities in all respects in compliance with applicable USDA standards.

(iii)    Oberto may initiate and pay for independent inspection from a qualified USDA approved laboratory not more than one (1) time per calendar year.



d.   Inspection and Compliance with Brazilian Regulations

(i)   federal, state and municipal Brazilian authorities, including but not Manufacturer shall submit itself to the inspection of the relevant limited to "Agência Nacional de Vigilância Sanitária - ANVISA" and "Secretaria de Vigilância Sanitária do Ministério da Saúde - SVSMS".

(ii)   Even though the totality of the Products shall be exported to Oberto, Manufacturer declares that such Products may be produced in Brazil in compliance with USDA Rules of manufacturing and that such situation shall not cause a breach of Brazilian Law, as expressly determined by Section X, Article 54 of Law Decree No. 986/69.

(iii)   Manufacturer shall observe and comply with any and all laws, ordinances, rules and regulations enacted from Brazilian authorities ("Brazilian Regulations") related to the good maintenance of its production centers and export of Products, including but not limited to Law No. 9.782/99, Decree No. 3.029/99, Law No. 6.437/77, Law Decree No. 986/69, Ordinance of Ministry of Public Health No. 1.428/93, and Ordinance of Ministry of Public Health SVS/MS No. 326/97.

(iv)   Manufacturer shall observe and comply with any and all applicable rules for treatment and pouring out garbage and refuses, including but not limited to chemical or biological ones.

(v)   Manufacturer shall pay any and all costs related to food inspection duties charged by the relevant Brazilian authorities from Brazil and the United States.

e.   Manufacturing, Processing and Packaging Records

Manufacturer agrees that it will keep manufacturing, processing and packaging records showing the history of each grouping of the Product, such as, but not limited to, the number of items and lot numbers, dates of production, and quality control records, permitting identification and tracing of each lot, batch, unit, production run, or any other such identifiable grouping of the Product, as well as United States Department of Agriculture ("USDA") weight control records and any other information relating to the Products and



reasonably specified by Oberto, and will forward one counterpart to Oberto's offices by mail upon request.

f.    Intellectual Property

Manufacturer agrees to use its commercially reasonable best efforts to safeguard and protect from infringement, misuse or misappropriation the Products specifications, formulations and processes provided to Manufacturer by Oberto, and any proprietary information used in connection with or relating to the Products, and to take all commercially reasonable measures appropriate for this purpose, including, without limitation, segregating the processing and preventing observation of the processing by individuals not employed by Manufacturer.

4.    OPERATIONS

a.    Product Orders

Subject to the terms and conditions set forth herein, Manufacturer shall sell to Oberto quantities of the Products as ordered from time to time by Oberto electronically using a spreadsheet order form. Manufacturer shall produce and ship by method specified by Oberto the quantities of Products ordered by Oberto within fifteen (15) business days following the placement of Oberto's order.

b.    Delivery, Title and Risk of Loss

Title and risk of loss of the Products will pass to the Oberto upon delivery to Oberto's production facility in Kent, Washington and/or such other Oberto production facility or facilities as Manufacturer and Oberto may agree. Manufacturer agrees that it shall be solely responsible for all Products presented to Oberto, and in the event that such Products do not meet Oberto's specifications or are otherwise deemed by Oberto to be in damaged or defective condition, Manufacturer will reimburse or credit Oberto the corresponding price invoiced by Manufacturer for such Products. This shall not, however, be Oberto's sole remedy. Oberto will promptly report any observable discrepancies, defects and damages as may be discovered at any time by Oberto to Manufacturer; provided, however, failure by Oberto to inspect the Products shall not waive Oberto's right to reject defective Products as provided herein. Oberto will provide Manufacturer with a sample of any such defective Products rejected by Oberto. Oberto is responsible for Product damaged following the time of delivery to Oberto's

production facility in Kent, Washington and placement into a retail package, and the same shall not be returned to Manufacturer.

c.  Goodwill

Oberto shall use commercially reasonable best efforts to ensure the preservation of Manufacturer's reputation and goodwill. Manufacturer shall use its commercially reasonable best efforts to safeguard and protect against, and shall not knowingly cause, suffer or permit, any diminution or degradation of the reputation and goodwill associated with the Oberto name, the Products or trademarks and trade dress used in connection with the Products.

d.  Pricing

(i)  Manufacturer will sell the Products to Oberto at the prices and on the terms set forth in Exhibit "A" attached hereto ("Transfer Prices"). The terms of payment for all sales of the Products to Oberto shall be net twenty-one (21) days after the date of delivery to Oberto of the Products, by Electronic Fund Transfer ("EFT") in United States Dollars.

(ii)  Initial transfer prices on new Products shall be determined by agreement of Manufacturer and Oberto taking into account the formulas used to determine the initial transfer prices for the Products, with subsequent adjustment in accordance with Exhibit "A".

(iii)  Oberto may from time to time request that Product be shipped by air. Oberto agrees to pay the differential between Ocean shipping and shipment by air. Manufacturer will be responsible for any airfreight charges caused by Manufacturer's expediting to meet agreed upon delivery schedules.

e.  Recall and Reimbursement

(i)  If Product sold to Oberto by Manufacturer under this Agreement is found, due to some event that occurred prior to the time Oberto takes title to the Product to be contaminated or otherwise unfit for human consumption, Oberto will make a determination, and provide immediate written notice thereof to Manufacturer, as to the necessity of a Product withdrawal, retrieval, recall or other action to prevent the distribution and/or sale of the Product, plus the type, extent,



method of handling, disposition of Product and all other particulars involved in such an action, including publicity and public relations in connection therewith ("Recall"). All costs and expenses for retrieval, transportation, and Product loss, direct and consequential, shall be borne by Manufacturer.

(ii)     Manufacturer covenants that none of the Products will be subject to any FDA Class I or Class II recall, withdrawal, retrieval, recall or other action as designated by the United States Food and Drug Administration (or successor standards or agency) to prevent the distribution and/or sale of the Product, for any reason whatsoever.

f.     Cooperation

The parties agree to communicate regularly and to meet periodically and to take such other cooperative measures as may be reasonably necessary or appropriate to facilitate performance of this Agreement, including, without limitation, the following:

Not less than twice each calendar year, representatives of Manufacturer and Oberto will meet to review and evaluate operations under this Agreement over the prior six (6) month period, including, without limitation, capacity requirements, and to formulate action steps as the parties may in good faith deem necessary or appropriate. As part of this process Oberto shall provide Manufacturer with a sales forecast for the next six (6) months by Product flavor by period, which forecast may be revised by Oberto from time to time.

g.     Compliance With Laws

The parties will comply with any and all applicable laws, ordinances, rules and regulations of whatever jurisdiction now in effect, or which hereafter may be enacted pertaining to the conduct of their businesses and the manufacture and distribution of the Products.

5.     MINIMUM ORDER REQUIREMENTS

Commencing on October 1, 2001 or such later date as Oberto and Manufacturer may agree, Oberto agrees to order a minimum of 15,000 pounds of the Products per week. Beginning April 2002, Oberto agrees to order a minimum of 30% of agreed upon capacity as outlined in Section 3



provided the following conditions are met: 1) Manufacturer's transfer price is at an economic advantage when compared to Oberto's cost to produce the Products; and 2) Oberto is receiving orders that average a minimum of 40,000 pounds per week from Frito Lay North America.

6.   MANUFACTURER'S CONTINUING GUARANTEE

Manufacturer warrants that the Products comprising each and every shipment or other delivery made by or through Manufacturer to Oberto as of the time title passes to Oberto with respect to such shipment or delivery to be as follows:

a.   Not adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act, as amended, and an article which may not, under the provisions of Sections No. 404, 503 or 512 of said Act, be introduced into interstate commerce;

b.   In full compliance and conformity with all federal, state and local laws, regulations and procedures governing composition, adulteration, misbranding, packaging, registration, shipment, sale and labeling, including, without limitation, the Federal Food, Drug and Cosmetic Act, as amended, including the Food Additives Amendment of 1958; Federal Fair Packaging and Labeling Act; Federal insecticide, Fungicide and Rodenticide Act and Federal Hazardous Substances Labeling Act;

c.   If an article is or contains a flavor, it shall not be or contain an artificial flavor unless said article is so designated and identified as comprising artificial flavor(s);

d.   If an article is or contains a color additive, such color additive is or will be from a batch certified by Oberto, or its suppliers, where certification is required pursuant with the Federal Food, Drug and Cosmetic Act, as amended and all regulations issued under said Act;

e.   Manufacturer further guaranties that each and every article contained in such shipment or other delivery made by or through Manufacturer to Oberto were produced in compliance with all labor standards applicable to citizens of the Territory; and

f.   The guaranties and warranties given herein are continuing and shall be in full force and effect for the Term of this Agreement and nothing contained in any invoice, purchase order or other document can modify these guaranties and warranties.



7.    LIABILITY FOR INJURY

    a.    Manufacturer's Indemnity

Notwithstanding the limits of insurance set forth at Clause 8 to this Agreement, Manufacturer shall defend, indemnify and hold harmless Oberto, its affiliates and assigns, and their respective officers, directors, employees and agents against any and all claims, demands or suits of whatever nature for damages, direct and consequential (including, without limitation, costs, expenses and actual attorneys' fees) which may be made or recovered on account of any trauma, injury or death to any person whomsoever, or damage to or destruction of any property caused by, arising from, incident to, connected with or growing out of the possession, use or consumption by any person of any Product manufactured by Manufacturer, except that Manufacturer shall have no liability or responsibility to indemnify or hold harmless Oberto for claims, demands or suits for damages, (including costs, expenses and actual attorneys' fees) to the extent the same are caused by Oberto's gross negligence or willful misconduct. Manufacturer's obligations under this Section 7 shall survive any termination of this Agreement regardless of the nature or cause of any such termination.

    b.    Handling of Claims

Oberto shall adjust and handle all claims for trauma, injury, death or property damage for which indemnity is provided by Manufacturer under this Agreement ("Claim") using the following procedures:

    (i)    Oberto will send Manufacturer written confirmation of their receipt of each Claim;

    (ii)    Oberto will, within five (5) business days of receiving the Claim, make written contact with the claimant advising them that they are the party who will be responsible for handling the Claim;

    (iii)    Oberto will, within thirty (30) calendar days of receiving the Claim, provide Manufacturer with a written status report and a confirmation of the fact that they will handle the claim on the behalf of Manufacturer. All costs associated with any Claim, including without limitation all settlements, attorneys fees and costs of litigation shall be borne by Manufacturer;



(iv)  Oberto will provide Manufacturer with written status reports on all open claims on a quarterly basis; and

(v)  Prior to the final settlement of any Claim, to the fullest extent reasonably practical, Oberto shall provide Manufacturer with prior written notice and a reasonable opportunity to participate in the final settlement negotiations with respect any such Claim.

c.  <u>Oberto's Indemnity</u>

Oberto shall indemnify and hold harmless Manufacturer, its affiliates and assigns, and their respective officers, directors, employees and agents against any and all claims, demands or suits of whatever nature for damages direct and consequential (including, without limitation, costs expenses and actual attorneys' fees) which may be made or recovered on account of any trauma, injury or death to any person whomsoever, or damage to or destruction of any property caused by, arising from, incident to, connected with or growing out of the possession, use or consumption by any person of Product, to the extent same is caused by Oberto's negligence. Oberto's obligations under this Section 7 shall survive any termination of this Agreement regardless of the nature or cause of any such termination.

The provisions of this Clause shall survive the termination or expiry of this Agreement.

8.  <u>INSURANCE</u>

a.  The insurance requirements set forth herein are minimum coverage requirements and are not to be construed in any way as a limitation on Manufacturers liability under this Agreement.

b.  Manufacturer shall secure and keep in force during the Term of this Agreement at its sole cost and expense, the following types of insurance, with companies rated "A" or better and class size of "X" or greater by A.M. Best, with liability limits as follows:

(i)  Employer's Liability insurance with limits of not less than $500,000 per occurrence.

(ii)  Comprehensive or Commercial General Liability Insurance, on an Occurrence Basis (including but not limited to premises-operations, broad form property damage,

products/completed operations, contractual liability, independent contractors, personal injury) and Excess Liability, in the Umbrella Form and on an Occurrence Basis, with limits totaling not less than One Million U.S. Dollars (US $1,000,000) combined single limit for each occurrence, which amount shall be indexed annually.

 (iii) Excess Liability, in the Umbrella Form and on an Aggregate Basis, with limits of at least Ten Million U.S. Dollars (US $10,000,000)

c. Oberto may at its sole cost and expense also maintain product liability and other insurance coverage with respect to sale of the Products.

d. For each policy of insurance specified at subparagraph b. above, upon the execution of this Agreement Manufacturer shall furnish to Oberto a Certificate of Insurance, provided, however, Oberto is under no obligation to review the Certificate of Insurance or to notify Manufacturer that the Certificate of Insurance is not in compliance with the insurance requirements. All such certificates and policies shall include a provision whereby Oberto shall be given thirty (30) days advance written notice of the insurer's intention to cancel or materially change the policies specified herein. Such policy shall be primary to any coverage Oberto may have, independent of this Agreement. The insurance specified in subsection (iii) above shall include an endorsement specifically naming Oberto as an additional insured. Oberto shall provide Manufacturer with a Certificate of Insurance for any policy of insurance maintained as contemplated under subparagraph c. above, showing Manufacturer as an additional insured thereunder.

e. In case of failure by Manufacturer to furnish said Certificates of Insurance or cancellation of any required insurance, Oberto may immediately terminate this Agreement. Manufacturer further agrees to and does hereby indemnify and hold Oberto harmless from any loss, damage or expense, direct or consequential, resulting from Manufacturer's failure to have and maintain such insurance in conformance with this Clause.

9. <u>NO FRANCHISE OR AGENCY</u>

a. Nothing in this Agreement shall be deemed to make the parties agents or representatives of either party for any purpose whatsoever. Nothing provided in this Agreement shall be deemed to grant either



party any right or authority to assume, create or expand any obligation or responsibility, express or implied, on behalf of or in the name of either party, or to bind either party in any manner or matter whatsoever;

b.    It is the express intention of the parties that each party holds the other harmless of, from and against any and all claims, liability and expenses arising out of any unauthorized act of the party; and

c.    Oberto does not exercise significant control over the Manufacturer's method of operation, has not promised to give Manufacturer significant assistance in its operation, and has not required a payment to be made in connection with the granting of this Manufacturing Agreement (other than payment for the Products purchased pursuant to this Agreement). Accordingly, the parties agree that this Agreement does not constitute a franchise, nor is Manufacturer to be deemed to be a "franchisor" nor is any operation of Oberto that results from execution of this Agreement deemed to be a "franchise operation".

10.    <u>NOTICE</u>

Any notice or other communication required under this Agreement shall be addressed as follows:

If to Oberto, to:          Oberto Sausage Company
                               Mr. Thomas Campanile
                               Office of the President
                               7060 South 238th Street
                               Kent, WA 98032

With copy to:         Robert H. Lamb, Esq.
                               700 Fifth Avenue, Suite 5800
                               Seattle, WA 98104

If to Manufacturer, to:    Bertin Ltda.
                               Fernando Antonio Bertin
                               Director
                               Parque Industrial - Caixa Postal 350
                               CEP 16404-110 – Lins/SP – Brasil

With copies to:       Bertin Ltda.
                               Evandro Miesse Mente
                               Industrial Director
                               Parque Industrial – Caiza Postal 350



CEP 16404-110 – Lins/SP – Brasil

Bertin Ltda.
Arnauldo Priviatto
Commercial Manager
Parque Industrial – Caiza Postal 350
CEP 16404-110 – Lins/SP – Brasil

A copy shall be sent to the attention of "Law Department" at the same address.

Any notice required to be given pursuant to this Agreement shall be in writing and shall be deemed to have been duly given when personally received, or the business day following confirmation of transmission if sent by facsimile, or the next business day if sent by overnight delivery service. Either party may change the above notice addresses by written notice to the other party.

11.    <u>AUTHORITY</u>

    a.    <u>Oberto's Authority</u>

Oberto warrants that the terms and conditions of this Manufacturing Agreement were fully read and understood and that they constitute the entire agreement between the parties. Oberto represents and warrants that it is a corporation validly existing under the laws of the State of Washington and has full corporate power and authority to execute, deliver and comply with the terms of this Agreement, which has been duly and properly authorized, executed and delivered by Oberto, and that this Agreement constitutes the legal, valid and binding obligation of the Oberto, enforceable against Oberto in accordance with its terms.

    b.    <u>Manufacturer's Authority</u>

Manufacturer warrants that the terms and conditions of this Manufacturing Agreement were fully read and understood and that they constitute the entire agreement between the parties. Manufacturer represents and warrants that it is a corporation validly existing in accordance with the laws of the country of Brazil state of San Paulo and has full corporate power and authority to execute, deliver and comply with the terms of the Agreement, which has been duly and properly authorized, executed and delivered by Manufacturer, that this Agreement constitutes a legal, valid and

binding obligation of Manufacturer enforceable against Oberto in accordance with its terms.

12.    WAIVER

The failure of either party to enforce at any time any of the provisions of this Agreement shall not be construed to be a waiver of such provisions or of the right of any such party thereafter to enforce any such provisions.

13.    DEFAULT AND TERMINATION

In the event that either party to this Agreement shall fail to timely perform and fulfill in any material respect any obligation or condition required of such party under this Agreement or shall breach in any material respect any of its representations or warranties contained herein, and such failure or breach of such defaulting party shall not be attributable to any failure of the nondefaulting party to timely perform and fulfill in any material respect any obligation or condition required of the nondefaulting party under this Agreement, and such failure or breach shall continue for a period of thirty (30) days (or ten (10) days, in the case of payment of monies due) after receipt by the defaulting party of written notice from the nondefaulting party requesting that the defaulting party remedy such failure or breach (which notice from the nondefaulting party shall make specific reference to the nondefaulting party's rights under this Clause 13), and the defaulting party shall not have commenced and continued diligently efforts to cure such failure or breach, and the nondefaulting party shall have timely performed and fulfilled (or shall have been ready, willing and able to timely perform and fulfill) in all material respects the obligations and conditions required of the nondefaulting party under this Agreement and shall not have breached in any material respect any of its representations or warranties contained herein, then, at any date after the expiration of such thirty (30) day notice period (or ten (10) days, in the case of payment of monies due), the nondefaulting party may, by written notice to the defaulting party, terminate this Agreement. The nondefaulting party shall have the right to bring an action against the defaulting party and pursue any and all remedies which nondefaulting party may have at law or in equity, subject to the requirements of Clause 23 to this Agreement.

14.    TERMINATION

This Agreement may be terminated as follows:

a.    By Manufacturer or Oberto



Either Manufacturer or Oberto may upon written notice to the other terminate this Agreement forthwith:

(i) If the other party shall make an assignment for the benefit of creditors or shall file a voluntary petition in bankruptcy or shall be adjudicated a bankrupt or insolvent or shall file any petition or answer seeking reorganization, arrangement, liquidation or similar relief or shall file an answer admitting the material allegations of a petition against it for any such relief; or

(ii) If the other party becomes insolvent or fails to pay its debts when they come due; or

(iii) If within 60 days after the commencement thereof, any proceeding against the other party seeking reorganization, arrangement, liquidation or similar relief shall not have been dismissed; or

(iv) Upon mutual consent of Manufacturer and Oberto; or

(v) Upon impossibility of performance, as follows:

In the event the other party is unable to comply with any material term of this Agreement by operation of Force Majeure as provided at Clause 15 to this Agreement, and such failure to comply shall continue for a period of six (6) months; or

(vi) Upon Default by the other party as provided at Clause 13 to this Agreement.

b. <u>By Manufacturer</u>

(i) Upon any sale, transfer, lease, assignment or other disposition, whether by operation of law or otherwise, of more than thirty-one percent (31%) of Oberto's stock, equity securities or assets to any other entity that has products that compete directly (or through any subsidiary, affiliate, or other business entity controlled by or under common control with such entity) with any Manufacturer related product line or service, or upon the occurrence of any transaction which results in a transfer of ownership or control of Oberto to such company or other entity, unless Manufacturer has expressly consented in writing thereto (in its sole discretion), such

election by Manufacturer to consent or terminate to be made within ninety (90) days of Manufacturer's receipt of prior written notice of such sale or transfer by Oberto, and in the absence of express written consent by Manufacturer within such (90) day notice period, this Agreement shall terminate on the later of (a) consummation of the transaction for which the notice was given or (b) expiration of such (90) day notice period; or

(ii)     Upon Oberto's acquisition, whether by operation of law or otherwise, of more than thirty-one percent (31%) of the stock, equity securities or assets of any other entity that has products that compete directly (or through any subsidiary, affiliate, or other business entity controlled by or under common control with such entity) with any Manufacturer related product line or service, or upon the occurrence of any transaction which results in a transfer of ownership or control of any such entity to Oberto, unless Manufacturer has expressly consented in writing thereto (in its sole discretion), such election by Manufacturer to consent or terminate to be made within ninety (90) days of Manufacturer's receipt of prior written notice of such acquisition by Oberto, and in the absence of express written consent by Manufacturer within such (90) day notice period, this Agreement shall terminate on the later of (a) consummation of the transaction for which the notice was given or (b) expiration of such (90) day notice period; or

The lawful termination of this Agreement by Manufacturer shall not give rise to any right of compensation in favor of Oberto for losses of profit or revenues reduction of any kind whatsoever.

c.     <u>By Oberto</u>

Oberto may also terminate this Agreement forthwith:

(i)     Upon any Manufacturer Recall classified as Class I or Class II by the United States Food and Drug Administration as provided at Clause 4.e. to this Agreement that is the result of the Manufacturer; or

(ii)     Upon any sale, transfer, lease, assignment or other disposition, whether by operation of law or otherwise, of more than thirty-one percent (31 %) of Manufacturer's stock, equity securities or assets to any other entity that has

products that compete directly (or through any subsidiary, affiliate, or other business entity controlled by or under common control with such entity) with any Oberto related product line or service, or upon the occurrence of any transaction which results in a transfer of ownership or control of Manufacturer to such company or other entity, unless Oberto has expressly consented in writing thereto (in its sole discretion), such election by Oberto to consent or terminate to be made within ninety (90) days of Oberto's receipt of prior written notice of such sale or transfer by Manufacturer, and in the absence of express written consent by Oberto within such (90) day notice period, this Agreement shall terminate on the later of (a) consummation of the transaction for which the notice was given or (b) expiration of such (90) day notice period; or

(iii)   Upon Manufacturer's acquisition, whether by operation of law or otherwise, of more than more than thirty-one percent (31 %) of the stock, equity securities or assets of any other entity that has products that compete directly (or through any subsidiary, affiliate, or other business entity controlled by or under common control with such entity) with any Oberto related product line or service, or upon the occurrence of any transaction which results in a transfer of ownership or control of any such entity to Manufacturer, unless Oberto has expressly consented in writing thereto (in its sole discretion), such election by Oberto to consent or terminate to be made within ninety (90) days of Oberto's receipt of prior written notice of such acquisition by Manufacturer, and in the absence of express written consent by Oberto within such (90) day notice period, this Agreement shall terminate on the later of (a) consummation of the transaction for which the notice was given or (b) expiration of such (90) day notice period; or

(iv)   Upon the occurrence of any of the following: (a) cancellation or layoff of Manufacturer's registries and licenses by any reason; (b) default in complying with Brazilian Regulations; (c) Manufacturer's restraint of trade determined by any Brazilian Authority, including but not limited to those in charge of food and drug administration; and/or (d) Clause 1.b to this Agreement.



The lawful termination of this Agreement by Oberto shall not give rise to any right of compensation in favor of Manufacturer for losses of profit or revenues reduction of any kind whatsoever.

15.    <u>FORCE MAJEURE</u>

Neither Oberto nor Manufacturer shall be held liable for any failure to comply with any of the terms of this Agreement caused solely by fire, acts of God, strike, war, insurrection, government restriction, catastrophic industry-wide interruption in meat supply, or other causes beyond its control and without its fault, but not to include cost increases independent of such causes, <u>provided</u> the party failing to comply shall use all reasonable endeavors to cure such failure and comply with the terms of this Agreement as quickly as possible, including, without limitation, securing alternate sources of supply or manufacture.

16.    <u>CONFIDENTIAL INFORMATION</u>

During the term of this Agreement, each party will be exposed to confidential proprietary information belonging to the other which pertains to the operation of the other's business. In particular, each party will be exposed to information and data including, but not limited to, economic information, business plans, marketing strategy, data, technical information, know-how, process and product information, environmental concerns, and methods of manufacture (hereinafter "Information"). Each party agrees to hold in confidence and agrees not to disclose to others without the prior written consent of the other, all Information which has been or will be disclosed to it either directly or indirectly and to limit its use of Information solely in conjunction with its performance under this Agreement. It is understood that the foregoing obligations of confidentiality and non-use do not apply to any Information (a) which was in possession of the nonowning party at the time of disclosure and was not acquired directly or indirectly from the other party, (b) which was in the public domain at the time of disclosure, (c) which, after disclosure, becomes part of the public domain through no fault of the non-owning party, or (d) which after disclosure, is obtained by the non-owning party from a third party who is lawfully in possession of such Information and is not subject to an obligation to treat such Information as confidential. All Information is and shall remain the property of the party owning it and all worksheets, work product and other tangibles made or received by the other that are based in whole or in part on the owing party's Information will be the sole property of the owning party and subject to the aforementioned obligations of confidentiality and non-use. Upon completion or termination of this Agreement for any reason, or upon written demand, each party agrees to destroy or deliver to the other all tangible forms of Information belonging to the other. Manufacturer agrees

not to produce the Products or similar products for five years (5) following the date of termination of the agreement. This provision shall survive the termination of this Agreement.

17.   ASSIGNMENT

Except as may be expressly provided otherwise elsewhere in this Agreement, the parties agree as follows:

   (i)   Rights hereunder are not assignable by Oberto or the obligations imposed on Oberto delegable unless Oberto shall have first obtained the prior written consent of Manufacturer, which consent shall not be unreasonably withheld or delayed, except to a majority-owned subsidiary or parent entity of Oberto, an entity under common ownership or control, or to a successor to Oberto and its business by way of merger, acquisition, purchase of assets or otherwise and his Agreement is and shall be binding upon and inure to the benefit of any such parent, subsidiary or successor; and

   (ii)   This agreement is not assignable by Manufacturer except to a majority-owned subsidiary or parent entity of Manufacturer, an entity under common ownership or control, or to a successor to Manufacturer and its business by way of merger, acquisition, purchase of assets or otherwise and this Agreement is and shall be binding upon and inure to the benefit of any such parent, subsidiary or successor.

18.   NON-COMPETITION

For the five (5) year period beginning after the termination of this Agreement, Manufacturer shall not, directly or indirectly (i) produce the Products or similar products for any other party inside or outside the Territory, (ii) sell, market or distribute the Products or similar products inside or outside the Territory; (iii) compete in any way with Oberto; and (iv) participate in or consult with any company which competes with Oberto inside or outside the Territory. In the event that (i) Oberto terminates this Agreement based on any one or more of the provisions of Section 14 above, and (ii) an arbitrator appointed pursuant to Section 23 c below determines that there was no legal basis under Section 14 above to support such termination, then Manufacturer shall not be required to comply with the noncompetition restrictions contained in this Section 18 from date of such arbitrator's determination forward.



19.    TAXATION

Manufacturer shall be responsible for the payment of any and all taxes, duties and levies applicable to any event included in the manufacturing, sale, distribution and export of the Products to Oberto.

Manufacturer assumes that Oberto shall not be held responsible for any tax or similar burden resulting from or in connection with Brazilian Law.

Manufacturer shall hold and keep Oberto harmless from any tax or similar collection eventually imposed by Brazilian Tax Authorities and reimburse any expense related to the defense of Oberto's interests before Brazilian Tax Authorities.

20.    ENTIRE AGREEMENT

This Agreement and all exhibits, attachments, and schedules, if any, hereto, constitutes the entire agreement between the parties pertaining to the subject matter thereof, and there are no binding understandings between the parties pertaining to the subject matter hereto that are not contained in this Agreement. This Agreement shall supersede and cancel any and all previous contracts, arrangements or understandings that may have existed or may exist on these matters between the parties.

21.    SEVERABILITY

If any provision of this Agreement is declared illegal, unenforceable, ineffective or void, the remainder of the Agreement shall not be affected thereby.

22.    GOVERNING LAW: CONSENT TO JURSIDICTION AND VENUE

**THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF WASHINGTON IN THE UNITED STATES OF AMERICA. THE PARTIES HERETO HEREBY CONSENT TO AND AGREE TO THE JURISDICTION AND VENUE OF THE STATE AND FEDERAL COURTS LOCATED IN SEATTLE, WASHINGTON, USA FOR ANY ACTION BROUGHT TO ENFORCE THE PROVISIONS OF THIS AGREEMENT.**



23.  **RESOLUTION OF DISPUTES**

   a.   <u>Disputes</u>

The parties shall attempt in good faith to resolve all claims, disputes and controversies of whatever nature (including in contract, tort or equity) that arise out of or relate to this Agreement or the relationship of the parties (collectively "Dispute") promptly by negotiation between executives with authority to settle such Dispute.

If the Dispute has not been resolved by negotiation within thirty (30) days of the disputing party's notice, or if the parties' executives failed to meet within twenty (20) days, the parties shall endeavor to resolve the Dispute by mediation under the then current Center for Public Resources Model Mediation Procedure for Business Disputes (or, if not available, such other similar procedures as the parties may mutually agree to substitute).

   b.   <u>Offer to Settle</u>

If during the mediation, a party makes a written offer which is not accepted by the other party and the refusing party subsequently fails to obtain a more favorable judgment or award, the refusing party will be liable to the offering party for all costs and expenses (including reasonable attorney's fees) incurred by the offering party to settle the Dispute from the time the settlement offer was made. All applicable statues of limitation and defense based upon the passage of time will be tolled for the duration of the mediation. Each party will continue to perform this Agreement and fulfillment of Oberto's orders pending the final resolution of the Dispute.

   c.   <u>Arbitration</u>

Any and all disputes arising under this Agreement which are not settled in accordance with clauses' (a) and (b) above shall be submitted to binding arbitration with the American Arbitration Association in Seattle, Washington and shall be subject the American Arbitration Association rules governing commercial arbitrations; provided that Oberto may seek injunctive relief for any matter in the state and federal courts located in Seattle, Washington. Any award rendered pursuant to an arbitration hereunder shall be nonappealable and may be entered as a judgement in state and federal courts located in Seattle, Washington and in Brazil.



Decl. of T. Ennis - 36

24. **ATTORNEYS' FEES**

Subject to Clause 23.b. to this Agreement, if any legal action or other proceeding (other than mediation) is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover reasonable attorneys' fees, court costs and all reasonable expenses even if not taxable as court costs (including, without limitation, all such fees, costs and expenses incident to appeals), incurred in that action or proceeding, in addition to any other relief to which such party or parties may be entitled.

25. **PUBLICITY**

Neither party shall use the name of the other party in any news release, sales brochure, publicity notice or other publication without the prior express written approval of that party, unless otherwise required by law. Manufacturer and Oberto shall work together on the timing and content of the press releases and press relations relating to this Manufacturing Agreement.

26. **HEADINGS**

Headings are used in this Agreement for convenience only and shall not affect the meaning or operation of this Agreement.

27. **REFERENCES**

Wherever the text may require, any pronoun used in this agreement shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns, pronouns and verbs shall include the plural and vice versa. Unless the context requires otherwise, reference to Clauses or exhibits are to Clauses or exhibits to this Agreement.

28. **FURTHER ASSURANCES**

Each party shall execute and deliver all other instruments and take all other actions as may reasonably be required by Law or Governmental Authorities from time to time to implement this Agreement.



IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

**BERTIN LTDA.**                                  **OBERTO SAUSAGE COMPANY**

By: _____            By: _____

Name: _Fernando Bertin Bertin_            Name: _THOMAS A. CAMPANILE_

Title: _DIRETOR_                               Title: _President_

Decl. of T. Ennis - 38

## Exhibit "A"

### EXHIBIT A:  PRICE SCHEDULE

**TRANSFER PRICE AND ADJUSTMENTS**

TRANSFER PRICE

The initial Transfer Prices and configurations are:

| Description | Quantity-Configuration |
|---|---|
| Original natural style jerky | 1 kg |
| Hickory natural style jerky | 1 kg |
| Peppered natural style jerky | 1 kg |

ADJUSTMENTS  BASED  ON  INCREASES  AND  DECREASES  IN  MANUFAC-
TURING COST

**Increases and decreases:** Initial transfer prices will be calculated based on the following formula for each Product and adjusted every 6 months based on the following formula with the product processed and packaged in bulk for work in process by Oberto and packed for ocean shipment by Manufacturer:

Oberto cost for Product per pound in United States Dollars = Raw materials plus direct labor and direct labor fringe benefits plus bulk packaging.

Manufacturer cost for Product per pound in United States Dollars = Raw materials  plus  direct  labor  and  direct  labor  fringe  benefits  plus  bulk packaging  plus  ocean  shipment  to  Oberto's  Kent,  Washington  USA warehouse plus all sales and excise taxes, import fees, taxes, tariffs, duties and inspections.

<u>Transfer Price Formula</u>

Oberto cost less Manufacturer cost equals Cost Differential.

Manufacturer cost  plus  fifty  percent  (50%)  of  Cost  Differential equals Transfer Price per pound in United States Dollars.

For  example,  if  Oberto's  cost  is  $4.71/pound  USD  and Manufacturer's cost is $2.75/pound USD the Cost Differential is $4.71 less $2.75 or $1.96. $1.96 multiplied by fifty percent (50%) equals $0.98. The



Obe001 002 cj263902 10/27/01

Decl. of T. Ennis - 39

Manufacturer's cost of $2.75 plus $0.98 equals $3.73, which is the transfer price per pound USD for the Product.

• From September 1, 2001 through the termination of this Agreement, Manufacturer may only change the Transfer Price if the Transfer Price Formula calculates a Transfer Price that exceeds the previously established Transfer Price by five percent (5%).

For example, if the Transfer Price is $3.73, and the new Transfer Price is calculated to be $3.89 the transfer price will not change because the percentage increase does not exceed five percent 5%. $3.89 less $3.73 equals $0.16. $0.16 divided by $$3.73 equals 4.3%. Because 4.3% is less than 5% no adjustment will be made to the transfer price.

For example, if the Transfer Price is $3.73, and the new Transfer Price is calculated to be $3.60 the transfer price will not change because the percentage decrease does not exceed five percent 5%.$3.73 less $3.60 equals $0.13. $0.13 divided by $3.73 equals 3.5%. Because 3.5% is less than 5% no adjustment will be made to the transfer price.

For example, if the Transfer Price is $3.73, and the new Transfer Price is calculated to be $4.13 the transfer price will change because the percentage increase exceeds five percent 5%. $4.13 less 3.73 equals $0.40. $0.40 divided by $3.73 equals 10.7%. Because increases are limited to 10% in a year as outlined below the new Transfer Price will be $3.73 plus 10% or $4.10.

**Limitations on Increases:** Notwithstanding the foregoing, Manufacturer may not increase the Transfer Price in any year (measured from January through December) more than 2 times and increases shall be limited to a maximum of 10% per year.

**Request to Review Cost:** Either Manufacturer or Oberto may request to review the cost provided by the other party. Manufacturer or Oberto will provide the other party with sufficient documentation to support the cost supplied to the other party. Manufacturer agrees that they have great latitude in establishing the cost of uncooked meat and will not report cost that is higher than the same or similar raw material used to process other meat products in Manufacturer's facilities. The Manufacturer's cost must always be competitive with other manufacturers of similar products in Brazil.

**Other Products shall be added by agreement of the parties according to the following:** Manufacturer or Oberto may at any time suggest the addition of new Products to be manufactured in accordance with this Agreement. The parties shall meet to discuss key product attributes including, but not limited to initial transfer price and production quantities. Oberto shall decide whether or not to add the new Products. If there is an agreement to add the new Products, the parties shall work together to develop and agree



Obe001 002 cj263902 10/27/01

Decl. of T. Ennis - 40

upon any adjustment to the responsibilities, duties and obligations of Manufacturer and Oberto in connection with the new Products in keeping with the terms of the Agreement. The parties agree to amend this Exhibit A in writing to add any new Products agreed upon by the foregoing effort. Such amendment shall specify, at a minimum, a description of the product as contemplated under Clause 1.a. of this Agreement, initial Transfer Price quantity configuration for the product. Pricing for new products shall be subject to adjustment in the same manner as set forth above.

Obe001 002 cj263902 10/27/01

Decl. of T. Ennis - 41

## Addendum to Exhibit "A"

**Revised Pricing Formula**

Effective January 1st 2007, the pricing formula is revised for a period of 24 months ending on December 31st 2008:  After December 31, 2008, this addendum expires unless both parties agree to extend the addendum by September 30, 2008.

To calculate the FOB price, the prior 90 day average of the U.S dollar per arroba is multiplied by an index of .159 to determine the FOB Lins, Brazil price for the next 90 days.  This formula is further is limited to a plus or minus 10% annual maximum based on the average of the prior year FOB price.  Each 90 day pricing period is further limited to plus or minus 5% of the previous 90 day price. The effective day of each pricing period is the first day of the months January 1st, April 1st, July 1st and October 1st.

To calculate the FOB price of thin style, the prior 90 day average of the U.S. dollar per arroba is multiplied by an index of .192 to determine the FOB Lins, Brazil price for the next 90 days.  This formula is further is limited to a plus or minus 10% annual maximum based on the average of the prior year FOB price.  Each 90 day pricing period is further limited to plus or minus 5% of the previous 90 day price. The effective day of each pricing period is the first day of the months January 1st, April 1st, July 1st and October 1st.

To calculate the delivered price per pound to Oberto, freight, duty, custom fees and 50% of the Sampco 12/31/06 commission rate is added to the FOB Lins, Brazil calculated price. Additional fees for expedited shipments will be dealt with on a case by case basis.

The index used for currency is from Banco de Central Brasil found on the web site
http://www5.bcb.gov.br/pec/taxas/ingl/ptaxnpesq.asp?id=quotations
The closing offer price is used for the currency translation.

The index used for cattle is from CEPEA is Média SP a prazo (mercado físico) found on the web site http://www.cepea.esalq.usp.br/boi/.
The value Prazo in $R is divided by the closing currency quote for the corresponding day to determine the index value of price per arroba in $US for the day.  The average of the daily index values for each 90 day period is used for the index calculation.

The starting price will be $4.02 per pound for springboard product and $4.85 per pound for thin style. The following pricing limits for spingboard apply for the initial period

|  | **Plus** | **Minus** |
|---|---|---|
| Annual 10% limit | $4.422 | $3.681 |
| Period 2  5% limit | $4.221 | $3.819 |

The annual 10% limit for 2008 is calculated on the average actual FOB price invoiced from **Period 1** to **Period 4** in 2007
The pricing index will be calculated for the following pricing periods:

| **Index Period** | used for ......... | **Pricing Period** |
|---|---|---|
| Oct 1 to Dec 31 | **Period 1** | Jan 1 to Mar 31 |
| Jan 1 to Mar 31 | **Period 2** | Apr 1 to Jun 30 |
| Apr 1 to Jun 30 | **Period 3** | Jul 1 to Sep 30 |
| Jul1 to Sep 30 | **Period 4** | Oct 1 to Dec 31 |

For example, if the 90 day average of the U.S. dollar per arroba is $27 for **Period 1** from January 1st to March 31st, the formula price for **Period 2** (April 1st to June 30th) is ($27*.159= $4.293 subject to the 5% limit and 10% limit tests. Since the calculated price is greater than the plus 5% limit of $4.221 (**Period 1** price of $4.02 plus 5%), the price for **Period 2** - April 1st to June 30th is limited to $4.221.

If the 90 day average of the U.S. dollar per arroba is $23 for **Period 2** from April 1 to June 30th, the formula price for **Period 3** is $3.657 ($23*.159=$3.67) subject to the 5% limit and the 10% limit tests. Since the **Period 3** 5% limit is the **Period 2** price of $4.221 minus 5% or $4.01 the **Period 3** price is limited to $4.01.

If the 90 day average of the U.S dollar per arroba is $25 for **Period 3** from July 1 to September 30, the formula price for **Period 4** is $3.98 subject to the 5% limit and the 10% limit tests. Since the **Period 4** 5% limit is the **Period 3** price of $4.01 minus 5% or $3.809 the **Period 4** price does not reach the 5% limit and is $3.98

The 10% limit for 2008 is calculated using the average actual FOB price invoiced ($4.02 plus $4.22 plus $4.01 plus $3.98) / 4 equals $4.06.

If the 90 day average of the U.S dollar per arroba is $26 for **Period 4** from October 1 to December 31, the formula price for **Period 1 2008** is $4.13 subject to the 5% limit and the 10% limit tests. Since the **Period 1** 5% limit is the **Period 4** price of $3.98 plus 5% or $4.17 the **Period 1** price does not reach the 5% limit and is $4.13.

Ministry of Finance

Press · Investor relations · Portuguese



Help | Contact us | Favorites | Glossary | Links | Site map | FAQ

**BANCO CENTRAL DO BRASIL**

www.bcb.gov.br Home → Exchange and Foreign Capital → Exchange rates → Quotations and bulletins

☑ : **About us**

- Accountability
- Addresses and phone numbers
- BC images
- Events
- History
- Organizational structure
- Presentations and speeches
- Strategic planning

☑ : **Inflation targeting**

- Copom - Monetary Policy Committee
- Inflation report
- Investor relations
- Norms
- Open letter

☑ : **Economy and finance**

- Bulletin
- Mercosur
- Monetary programming
- Outlook indicators
- Press releases
- Public finance
- Selic - Federal securities market
- Special Data Dissemination Standard

Ptax Closing Quotations[4] of UNITED-STATES-DOL, Currency Code: 220, Currency Simbol: USD, Currency Type: A, period from 05/11/2006 to 05/12/2006.

Click to download the complete table (▣ CSV - 2 KB)

| Date | Rate[1] | |
|------|-----|------|
| | **Bid** | **Offer** |
| 11/06/2006 | 2.13700 | 2.13780 |
| 11/07/2006 | 2.13450 | 2.13530 |
| 11/08/2006 | 2.14560 | 2.14640 |
| 11/09/2006 | 2.14040 | 2.14120 |
| 11/10/2006 | 2.14810 | 2.14890 |
| 11/13/2006 | 2.16120 | 2.16200 |
| 11/14/2006 | 2.15290 | 2.15370 |
| 11/16/2006 | 2.15090 | 2.15170 |
| 11/17/2006 | 2.15850 | 2.15930 |
| 11/20/2006 | 2.16140 | 2.16220 |
| 11/21/2006 | 2.16300 | 2.16380 |
| 11/22/2006 | 2.16150 | 2.16230 |
| 11/23/2006 | 2.16750 | 2.16830 |
| 11/24/2006 | 2.16920 | 2.17000 |
| 11/27/2006 | 2.17920 | 2.18000 |

| | | |
|---|---|---|
| Technical notes | | |
| Time series | | |
| Working paper series | | |

**Exchange and Foreign Capital**

Census of foreign capitals in Brazil
Exchange rates
Legislation and norms

☑ : **National Financial System**

Composition and evolution of National Financial System
Top 50 Banks in Brazil by Total Assets

☑ : **Supervision**

Financial Stability Report
PROER: Program of Incentives to the Restruct. and Strengthening of the Nat. Fin. System
Supervision manual

☑ **The Brazilian Payment System**

Brazilian Payment System Reform
Institutional aspects
Interbank Funds Transfer Settlement Systems
National Financial System Network
Payment instruments
Securities, Derivatives and Foreign Exchange Settlement Systems
Settlement Systems at a Glance
Statistical data
The Brazilian Payment System (PDF - 186 Kb)

☑ : **Banknotes and coins**

| Date | | |
|---|---|---|
| 11/28/2006 | 2.18620 | 2.18700 |
| 11/29/2006 | 2.17750 | 2.17830 |
| 11/30/2006 | 2.16600 | 2.16680 |
| 12/01/2006 | 2.16640 | 2.16720 |
| 12/04/2006 | 2.16850 | 2.16930 |
| 12/05/2006 | 2.15520 | 2.15600 |

1/ - Currency against Real.
4/ - Ptax Closing Rate = Weighted average rate of the transactions performed in the inter bank exchange market with settlement in two business days, calculated by Banco Central do Brasil as established in Communiqué 6815/99.

⌐ The Central Bank assumes no responsibility whatsoever for non-simultaneity or any lack of information, as well as for possible errors in currency parities or any other errors, except the parity of the United States dollar in relation to the Real. The institution also assumes no responsibilty for delays or the unavailability of telecommunications services, interruptions, failures or imprecisions in the providing of the services or information. The Central Bank likewise assumes no responsibility for any losses or damages consequent upon such interruptions, delays, failings or imperfections, as well as for the inadequate use of the information contained in the transaction.

Help | Privacy
All rights reserved to Banco Central do Brasil ⓒ

Decl. of T. Ennis -  45

- Banknotes
- Coins
- Museum of Money

☑ : **Education and culture**

- Art Gallery
- Cultural Centers



Boi

✉ boicepea@esalq.usp.br          ol - Français - Deutsch

- Foreign financial firms - representative offices in Brazil
- Inflation Targeting
- RMCCI - International Capital and Foreign Exchange Market Regulation
- Supervision

☑ : **Publications**

- By alphabetical order
- By themes
- Subscription of printed material



Áreas de
Pesquisas

Índices Exportação Agro »
PIB do Agronegócio »
Economia Ambiental »

30.11 - BOI: Indicador recua 10% no mês
Especulações ganham força no mercado a subir, arroba não | Mais alertas »
30.11 - BOI: Indicador recua 10% no mês
Especulações ganham força no mercado a subir, arroba não | Mais alertas »

| 23.11 - BOI:
09.11 - BOI: Carne volta

| 23.11 - BOI:
09.11 - BOI: Carne volta

O Indicador -
Metodologia
**CUSTOS DE PRODUÇÃO**
Mercado Internacional
Cadeia agroindustrial
Equipe



Addendum to "Revised Price Formula Addendum"

Effective from July 1st 2008, Oberto under actual contract and the addendum from January 1st 2007:

1. Oberto will not use Sampco's services effective from July 1st 2008, and no commission will be paid by Oberto to Sampco after this date. Oberto will be responsible for CIF charges from the port of Santos, Brazil to Kent, WA.

2. Oberto agrees to pay all the commission due to Sampco related of shipments from January 1st 2007 thru June 30th 2007.

3. Oberto agrees to pay Bertin 56 days from container Bill of Lading date in Santos.

4. Any product quality issues, as a result of manufacturing defects, will be dealt with via an Oberto invoice to Bertin.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date first above written.

BERTIN LTDA.                              OBERTO SAUSAGE COMPANY

By:                                       By:

Name: _Orlando M. Pena_                   Name: _Thomas A. Campanile_

Title: _Chief Operat. Officer_            Title: _President CEO_

Date: _7/23/2008_                         Date: _7/08/08_

# EXHIBIT B



April 30, 2010

Oberto Sausage Company
Mr. Thomas Ennis
Office of the President
7060 South 238th Street
Kent, Washington 98032

Dear Mr. Ennis:

We write with respect to the October 30, 2001 Manufacturing Agreement, as amended from time to time (the "Agreement"), between Oberto Sausage Company ("Oberto") and Bertin Ltda. (now known as JBS, S.A. after the merger between those companies) ("JBS"). On numerous occasions over the past several months, we have informed Oberto that it has failed to satisfy the minimum-order requirements set forth in Paragraph 5 of the Agreement. Unfortunately, Oberto has not cured this deficiency. To the contrary, Oberto has told us that for the foreseeable future it will not comply with the Agreement's minimum-order requirements. Oberto's actions constitute a material breach of the Agreement and an express repudiation of its terms, among other things. Accordingly, JBS hereby terminates the Agreement. JBS, however, remains open to discussing the possibility of a new business relationship with Oberto.

Nothing in this letter should be construed as a limitation or waiver of JBS's rights, claims, causes of action, remedies, or defenses, all of which are expressly reserved.

Sincerely,

José Augusto de Carvalho Junior
JBS, S.A.


cc:      Robert H. Lamb, Esq.

C:\Documents and Settings\mkornak\Local Settings\Temporary Internet Files\OLKBE\Oberto - Termination Letter - Bertin.doc_30_04_10.docx

Decl. of T. Ennis - 49

# EXHIBIT C



### JBS announces a Joint Venture with Jack Link's Beef Jerky

JBS S.A. (JBSS3) today announced that it has reached an agreement with Jack Link's Beef Jerky whereby the largest beef producer in the world is uniting with the number 1 U.S. meat snack brand to form a Joint Venture (JV) to operate two meat snack facilities owned by JBS in Brazil. The Brazilian facilities are located in Santo Antonio de Posse and Lins, in the State of São Paulo, and carry state of the art equipment to produce meat snacks specific to the needs of consumers worldwide.

Under the terms of the agreement, JBS will supply the raw material at market prices and will jointly operate the facilities in Brazil with Jack Link's. JBS will then sell the semi-manufactured product to Jack Link's Beef Jerky for further processing, packaging and distribution in the U.S. and elsewhere. Proceeds from the JV will be shared on a 50/50 ratio and is expected to become operative before the end of this year.

"We are forming an ideal partnership in bringing together the largest beef producer with the number 1 meat snack team to grow this business at a time when consumers are turning more and more toward healthy protein concentrated snacks", Wesley Batista, President and CEO of JBS USA commented. "With our competitive production skills and with Jack Link's meat snack expertise and brand strength, this JV will enhance business for both of us and grow the market for this healthy product", Mr. Batista added.

In addition to the JV, JBS also announced that it has reached an agreement with the same Jack Link's Beef Jerky group to sell its United States based meat snack plant in Mankato, Minnesota, for an undisclosed sum. This transaction is due to close by the end of this month and is subject to customary closing conditions.

"Partnering with JBS in Brazil enables us to be the best, jointly, at what we do, and the addition of the Mankato plant gives us the opportunity to expand on our existing production operations and enhance our ability to meet our customers' needs," said Jack Link, Chief Executive Officer and Chairman of the Board, Jack Link's Beef Jerky. "Essentially, this is a perfect match and we are very enthusiastic about its potential", Mr. Links added.

São Paulo, September 13th, 2010

**Jeremiah O'Callaghan**
**Investor Relations Officer**

### About JBS

JBS S.A. is currently the world's largest protein producer and exporter having a daily harvesting capacity of 91.1 thousand head of cattle, 48.5 thousand head of pork, 7.6 million birds and 24.5 thousand head of lamb. The company's operations includes 144 production plants, 61 located in Brazil, 6 in Argentina, 2 in Paraguay, 50 in the USA, 3 in Mexico, 11 in Australia, 8 in Italy and 1 in China, Russia and Uruguay. Additionally JBS S.A. has feedlot operations in the USA, Australia, Brazil and Italy, with a onetime capacity to feed 1.10 million head of cattle, a tannery business with capacity to process 154,500 M2 of hides per day and a dairy production capacity of 1,266 tons/day. JBS' net revenues in 2009 were R$ 34.3 billion.. The Company employs about 125 thousand people and its brands "Friboi", "Swift", "Swift and Company", "La Herencia", "1855 Swift Premium", "Maturatta", "Cabaña Las Lilas", "Organic Beef Friboi", "Anglo", "Mouran", "Plata", "King Island", "Beef City", "AMH", "Inalca", "Montana", "Ibise", "Gold Kist", "Vigor", "Leco" and "Bertin" are widely recognized as symbols of quality. More information about JBS S.A. is available at

Decl. of T. Ennis - 51

www.jbs.com.br/ir.

**JACK LINK'S BEEF JERKY – Feed Your Wild Side**
Headquartered in Minong, Wis., Jack Link's is the No. 1 U.S. meat snack brand and fastest-growing meat snack manufacturer worldwide. The Jack Link's brand represents a heritage of quality and consumer trust. Jack Link's products are available in retail outlets worldwide. Visit www.JackLinks.com for more information on the Jack Link's brand.

JBS S.A. © 2009 Todos os direitos reservados