THE HONORABLE BRIAN A. TSUCHIDA

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| OBERTO SAUSAGE COMPANY, | No. C10 - 02033 |
| Plaintiff, | DECLARATION OF BEVERLY KERSHAW |
| v. | |
| JBS S.A., | |
| Defendant. | |

BEVERLY KERSHAW declares:

1.  I am a paralegal at Perkins Coie LLP, the law firm representing plaintiff Oberto Sausage Company in this matter. I am over 18 years old, have personal knowledge of the matters set forth in this declaration, and am otherwise competent to testify to them.

2.  Attached to this declaration are true and correct copies of the following documents that are publicly available at the Investor Relations portion of defendant JBS' website at http://www.jbs.com.br/ir/ I created pdf's of each of these documents from this source and printed each on December 20, 2010:

> Exhibit A – Material Fact statement dated December 22, 2009, entitled "Merger of Bertin S.A. and Organizational Changes."

DECLARATION OF BEVERLY KERSHAW
(NO. C10 - 02033) – 1

**Perkins Coie LLP**
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

26097-0011/LEGAL19815295.1

Exhibit B – Material Fact statement dated December 31, 2009, regarding approval

of merger of Bertin into JBS S.A.

3.      Attached hereto as Exhibit C is a true and correct copy of a press release issued by

Link Snacks Inc. ("Link") dated September 13, 2010, entitled "Jack Link's Announces

Agreement to Acquire Mankato, Minn., Manufacturing Facility, Enters Joint Venture with JBS

in Brazil." I printed this exhibit from Link's website on December 20, 2010, at

http://www.jacklinks.com/#SubChannel_AboutUs_Newsroom.

4.      Attached as Exhibit D is a true and correct copy of a news story dated May 28,

2010, that is titled "Brazil JBS plant stops Beef exports to U.S." I printed this exhibit from

Reuters website on December 20, 2010, at

http://www.reuters.com/article/idUSN219885220100521.

5.      Attached as Exhibit E is a true and correct copy of a news story dated May 21,

2010, that is titled "Brazil suspends processed meat exports to U.S." I printed this exhibit from

Reuters website on December 20, 2010, at

http://www.reuters.com/article/idUSN2823592520100528.

6.      Attached as Exhibit F is a true and correct copy of a document created by the U.S.

Department of Agriculture Food Safety and Inspection Service ("USDA FSIS" and titled "Brazil

- Eligible Plants Certified to Export Meat to the United States" I printed this exhibit from the

USDA FSIS website on December 20, 2010, at

http://www.fsis.usda.gov/PDF/Brazil_establishments.pdf.

7.      Attached to this declaration are true and correct copies of the following

documents that are publicly available at the United States Security and Exchange Commission at

http://www.sec.gov. I created pdf's of each of these documents from this source and printed

each on December 20, 2010:

Exhibit G – Amendment No. 3 to Form S-1 Registration Statement of JBS USA

Holdings, Inc. dated January 4, 2010.

DECLARATION OF BEVERLY KERSHAW
(NO. C10 - 02033) – 2

Perkins Coie LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

26097-0011/LEGAL19815295.1

Exhibit H – Exhibit 10.1.16 to Amendment No. 3 to Form S-1 Registration Statement of JBS USA Holdings, Inc. dated January 4, 2010:  Raw Material Supply Agreement  by and between JBS USA Holdings, Inc. and Beef Products, Inc. dated February 27, 2008.

**I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.**

EXECUTED this 20th day of December, 2010.

_____
Beverly Kershaw

DECLARATION OF BEVERLY KERSHAW
(NO. C10 - 02033) – 3

**Perkins Coie** LLP
1201 Third Avenue, Suite 4800
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

26097-0011/LEGAL19815295.1

# EXHIBIT A

JBS S.A. | INVESTOR RELATIONS

| CORPORATE | DISCLOSURE AND | SHAREHOLDER | IN |
| INFORMATION | RESULTS | INFORMATION | SI |

## RELEASES AND MATERIAL FACTS

Font Size     |     Back     |     Print     |     E-mail     |     PDF     |     Download     |     Share

### Merger of Bertin S.A. and Organizational Changes

JBS S.A. ("Company") informs its shareholders and the market in general as follows:

Merger of Bertin S.A. and Organizational Changes

1. In the material fact disclosed on December 15.2009, the Company informs that a General Meeting of Shareholders will take place on December 31, 2009 to resolve on: (i) the corporate transaction of merger whereby the Company will take over Bertin S.A., without the issuance of new common shares of the Company, pursuant to applicable laws ("Merger"); and (ii) the reformulation of the size and composition of the Company's Board of Directors ("Governance Changes").

2. Considering that the Company desires to make clear some facts related to the merger's effects, the Company understands that it is in its best interest and in the best interest of the shareholders to inform that after the mentioned meeting takes place the transactions related to the product beef jerky, from both the Company and Bertin S.A., shall be concentrated in the affiliate company Beef Snacks do Brasil Indústria e Comércio de Alimentos Ltda., which is controlled by Beef Snacks International B.V., whilst the Company agrees to endeavor its best efforts to the effective implementation of such operational reorganization, in both financial and legal aspects.

São Paulo, December 22, 2009

Jeremiah O'Callaghan
Investors Relations Officer
JBS S.A.

Decl. of B. Kershaw - 5

# EXHIBIT B



**Material Fact**

**JBS S.A.**
**CNPJ No. 02.916.265/0001-60**
**NIRE No. 35.300.330.587**
**Authorized Capital Publicly Held Company**

**MATERIAL FACT**

JBS S.A. ("JBS" or "Company"), in accordance with the provisions of CVM Ruling 358/02, as amended, informs its shareholders and the market at large that the merger of its wholly-owned companies Bertin S.A. and JBS Couros Ltda. into the Company was approved at the extraordinary shareholders' meeting of JBS held on December 31, 2009.

The merger of Bertin into the Company, which has occurred after the prior approval of the merger of Bertin' shares into the Company at the extraordinary shareholders' meeting held on December 29, 2009 ("Dec. 29, 2009 Meeting"), represents an important step for the effectiveness of the integration of the operations of Bertin and JBS, as per the Material Facts published on September 16, 2009, October 22, 2009, December 7, 2009, December 14, 2009, December 15, 2009 and December 23, 2009. As a result of the corporate reorganization that has preceded the merger of Bertin into the Company, also disclosed in the Material Facts published on September 16, 2009, October 22, 2009, December 7, 2009, December 14, 2009 and December 15, 2009, the equity control of JBS remains with the Batista Family, through FB Participações S.A., which is the owner of shares representing approximately 60% of the Company's corporate capital.

Simultaneously, the Company had the satisfaction to successfully conclude, through its subsidiary JBS Holdings USA, Inc., the acquisition of the equity control of the US company Pilgrim's Pride Corporation, for USD 800 million, paid in cash, as disclosed in the December 28, 2009 Material Fact.

In this context, and as also approved at the Dec. 29, 2009 Meeting, the issuance of debentures in the total amount of R$ 3,479,600,000.00 (equivalent to USD 2 billion) has occurred. Such capitalization was supported by BNDES Participações S.A. - BNDESPAR, which has undertaken the firm commitment to subscribe up to the totality of the debentures, as per the December 14, 2009 and December 23, 2009 Materials Facts and the December 29, 2009 Notice to Shareholders.

All these transactions are inserted within the diversification and expansion strategy of JBS, aiming at the creation of a world leader in the animal protein sector and the reaffirmation of the position of Brazil in a highly competitive and globalized market.

São Paulo, December 31, 2009

**Jeremiah O'Callaghan**
**Investors' Relations Officer**

JBS S.A. © 2009 Todos os direitos reservados

# EXHIBIT C



**Contact:**
Nancy Knutson
Jack Link's Beef Jerky
(715) 466-2234
nancyk@jacklinks.com

**FOR IMMEDIATE RELEASE**

## JACK LINK'S ANNOUNCES AGREEMENT TO ACQUIRE MANKATO, MINN., MANUFACTURING FACILITY, ENTERS JOINT VENTURE WITH JBS IN BRAZIL

### *Joint Venture and Acquisition Provides Increased Production Capacity to Meet Growing Demand Both Now and in the Future*

**MINONG, WIS. (Sept. 13, 2010)** – Jack Link's Beef Jerky, the No. 1 U.S. meat snack brand, today announced that it has reached an agreement to acquire a packaged meat snack products manufacturing facility located in Mankato, Minn., from JBS S.A., the largest beef producer in the world. The transaction is expected to close by the end of September, subject to customary closing conditions. Terms of the deal were not disclosed.

The acquisition will enable Jack Link's to increase production capacity in order to meet growing consumer demand for the Jack Link's brand. The meat snacks category has grown 4.4 percent in 2010 year-to-date, and this agreement will help further position Jack Link's for future growth.

"JBS's Mankato plant is a perfect fit for our business with an experienced work force and management team," said Jack Link, chief executive officer and chairman of the board, Jack Link's Beef Jerky. "The addition of this plant gives us the opportunity to expand on our existing manufacturing operations and enhance our ability to meet our customers' needs," Mr. Link added.

The Mankato, Minnesota facility, which employs 85 people, currently manufactures packaged meat snack products under the Pioneer snack brand and other private labels. Jack Link's plans to retain current management and employees at the Minnesota plant.

In addition to the Mankato facility acquisition, Jack Link's announced that it has entered into a joint venture with JBS, S.A., to operate two manufacturing facilities in the state of Sao Paulo, Brazil. The joint venture will help Jack Link's ensure an adequate supply of product to meet growing demand and at the same time, provide the company with the necessary flexibility in its supply chain. With the acquisition and joint venture announcements, Jack Link's Beef Jerky will increase from nine to 12 the number of manufacturing facilities worldwide from which it sources meat snack production.

-more-

Decl. of T. Ennis - 9



Commenting on the joint venture, Link said, "This joint venture is highly complementary. It allows us to better leverage our strength in manufacturing and marketing meat snacks and JBS's strength in beef production to benefit the marketplace."

"We are forming an ideal partnership in bringing together the largest beef producer with the number 1 meat snacks team to grow this business at a time when consumers are turning more and more toward healthy protein concentrated snacks," Wesley Batista, President and CEO of JBS USA commented. "With our competitive production skills and with Jack Link's meat snack expertise and brand strength, this JV will enhance business for both of us and grow the market for this healthy product," Mr. Batista added.

### JACK LINK'S BEEF JERKY – Feed Your Wild Side

Headquartered in Minong, Wis., Jack Link's is the No. 1 U.S. meat snack brand and fastest-growing meat snack manufacturer worldwide. The Jack Link's brand represents a heritage of quality and consumer trust. Jack Link's products are available in retail outlets worldwide. Visit www.JackLinks.com for more information on the Jack Link's brand.

### About JBS S.A.

JBS S.A. is currently the world's largest protein producer and exporter having a daily harvesting capacity of 91.1 thousand head of cattle, 48.5 thousand head of pork, 7.6 million birds and 24.5 thousand head of lamb. The company's operations includes 140 production plants, 61 located in Brazil, 6 in Argentina, 2 in Paraguay, 50 in the USA, 3 in Mexico, 11 in Australia, 8 in Italy and 1 each in China, Russia and Uruguay. Additionally JBS S.A. has feedlot operations in the USA, Australia, Brazil and Italy, with a onetime capacity to feed 1.10 million head of cattle, a tannery business with capacity to process 154,500 M2 of hides per day and a dairy production capacity of 1,266 tons/day. JBS' net revenues in 2009 were R$ 34.3 billion. The Company employs about 125 thousand people and its brands "Friboi", "Swift", "Pilgrim's Pride" "La Herencia", "1855 Swift Premium", "Maturatta", "Cabaña Las Lilas", "Anglo", "King Island", "Gold Kist", "Vigor", "Leco" and "Bertin" are widely recognized as symbols of quality. More information about JBS S.A. is available at www.jbs.com.br/ir.



# # #

Decl. of T. Ennis - 10

# EXHIBIT D



» Print

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# Brazil suspends processed meat exports to U.S.

Fri, May 28 2010

BRASILIA, May 28 (Reuters) - Brazil has suspended exports of heat-treated meats to the United States pending a review of the differences in sanitary standards in the two countries which caused a cargo to be sent back to the Latin American country last week, the agriculture ministry said late on Friday.

Brazil, the world's top exporter of beef and chicken, imposed the ban late on Thursday. It is expected to be lifted once divergences in standards for meat have been settled, a spokeswoman told Reuters. It only exports heat-treated meat to the U.S., as no deal has been struck for fresh meat shipments.

"Brazil and the United States are going to harmonize procedures and analyze their methodologies," she said. "There should be an outcome from this in the coming days," she said, adding that all heat-treated meats including chicken would be affected.

Last week Brazilian meat producer JBS (JBSS3.SA: Quote, Profile, Research, Stock Buzz) said it had recalled a shipment of meat to the United States after American authorities detected excess levels of Ivermectin, a medicine that expels intestinal worms.

The spokeswoman said Brazil permits Ivermectin traces of up to 100 parts per billion, while in the United States, only 10 parts per billion are allowed.

(Reporting by Peter Murphy; Editing by David Gregorio)

© Thomson Reuters 2010. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

Decl. of B. Kershaw - 12

# EXHIBIT E



**» Print**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# Brazil JBS plant stops Beef exports to U.S.

Fri, May 21 2010

SAO PAULO, May 21 (Reuters) - The world's largest beef processor, Brazil's JBS (JBSS3.SA: Quote, Profile, Research, Stock Buzz), said exports to the United States from one of its plants had stopped after U.S authorities detected traces of medicine in its meat above permitted levels.

JBS said in a filing late on Thursday the meat processed at the Lins plant in Sao Paulo state was being recalled and the unit would not make further shipments to the U.S. until it was determined how meat with excess Ivermectin, a vermifuge or medicine that expels intestinal worms, entered the supply.

It said it had been informed of the problem by the Brazilian Agriculture Ministry.

The company said its other plants would serve the U.S. market while it investigates, making the financial impact on the firm negligible, adding that produce from the Lins plant would continue to serve other markets. (Reporting by Bruno Marfinati; Writing by Peter Murphy; Editing by Jon Loades-Carter)

© Thomson Reuters 2010. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# EXHIBIT F

May 27, 2010

**USDA, Food Safety and Inspection Service**
**Brazil - Eligible Plants Certified to Export Meat to the United States**

| EstForgnNBR | EstName | DTListed | DTDeListed | DTRelisted |
|---|---|---|---|---|
| SIF 0007 | General Meat Food Exportacao e Importacao Ltda. | 01/01/2001 | 04/09/2002 | |
| SIF 0013 | Ferrelra International Ltda. | 06/29/2005 | 05/27/2010 | |
| SIF 0042 | JBS S/A | 11/14/2005 | 05/27/2010 | |
| SIF 0049 | Independencia Alimentos LTD | 01/18/2006 | 05/12/2009 | |
| SIF 0076 | JBS S/A | 08/12/2005 | 05/27/2010 | |
| SIF 0226 | BE - Comercio e Industria, Importacao e Exportacao | 11/14/2005 | 05/27/2010 | |
| SIF 0333 | IFC International Food Company Industria de Alimen | 06/25/2007 | 03/31/2008 | |
| SIF 0337 | Bertin Ltda. | 08/22/2006 | 05/06/2010 | |
| SIF 0385 | JBS S/A | 11/15/2005 | 05/27/2010 | |
| SIF 0412 | Braskarne Comercio e Armazens Gerais Ltda. | 04/09/2002 | 09/08/2004 | |
| SIF 0421 | Industria e Comercio de Carnes Minerva Ltda. | 11/14/2005 | 05/27/2010 | |
| SIF 0431 | Minerva S.A. | 02/18/2009 | 05/27/2010 | |
| SIF 0458 | JBS S/A | 06/29/2005 | 05/27/2010 | |
| SIF 0471 | Kerry Do Brasil Ltda. | 11/14/2005 | 05/27/2010 | |
| SIF 0504 | Bertin Ltda. | 08/12/2005 | 05/27/2010 | |
| SIF 0736 | BF Productos Alimenticios Ltda. | 04/09/2002 | 08/25/2004 | |
| SIF 0745 | Minerva Dawn Farms Industria E Comercio de Protein | 11/19/2009 | 05/27/2010 | |
| SIF 0785 | Sadia S/A | 04/09/2002 | 09/03/2003 | |
| SIF 0862 | JBS S/A | 08/12/2005 | 05/27/2010 | |
| SIF 1001 | Perdigao Agroindustrial | 12/14/2001 | 04/09/2002 | |
| SIF 1651 | Frigorifico Extremo Sul S/A | 04/09/2002 | 05/06/2005 | |
| SIF 1662 | JBS S/A | 11/14/2005 | 05/27/2010 | |
| SIF 1690 | Beef Snacks do Brasil, Industria e Comercio de Ali | 07/19/2007 | 03/18/2010 | |
| SIF 1751 | Marfrig Frigorifico e Comerico de Alimentos S/A | 12/22/2008 | 05/27/2010 | |
| SIF 1793 | Arfrio Armazens Gerais Frigorificos | 04/09/2002 | 05/06/2005 | |
| SIF 2015 | Sadia S/A | 02/08/2006 | 05/04/2007 | |
| SIF 2023 | Mouran Alimentos Ltda. | 11/14/2005 | 07/31/2008 | |
| SIF 2051 | Frisa Frigorifico Rio Doce S/A | 06/29/2005 | 05/27/2010 | |
| SIF 2241 | Internacional Food Company, Industria De Alimentos | 12/08/2006 | 02/01/2008 | |
| SIF 2359 | Loitecnica Industria e Comercio Ltda. | 10/17/2003 | 05/06/2005 | |
| SIF 2427 | Brasfrigo S/A | 04/09/2002 | 05/06/2005 | |
| SIF 2471 | Independencia S.A. | 03/14/2008 | 04/16/2009 | |
| SIF 2500 | Marfrig Alimentos S/A | 10/28/2009 | 05/27/2010 | |
| SIF 2532 | Braslo Produtos De Carnes Ltda. | 05/18/2001 | 04/09/2002 | |
| SIF 2543 | Marfrig Frigorificos e Comercio de Alimentos Ltda | 06/29/2005 | 05/27/2010 | |
| SIF 2909 | Sadia S/A | 04/09/2002 | 05/06/2005 | |
| SIF 2979 | JBS S/A | 08/12/2005 | 02/27/2008 | |
| SIF 3031 | Frigorifico Quatro Marcos Ltda. | 01/06/2003 | 09/16/2003 | |
| SIF 3155 | Localfrio S/A - Armazens Gerais Frigorificos | 04/09/2002 | 05/06/2005 | |
| SIF 3181 | Bertin Ltda. | 08/12/2005 | 05/27/2010 | |
| SIF 3348 | Frigorifico Alto Norte Ltda | 01/18/2008 | 02/01/2008 | |
| SIF 3562 | Arfrio S/A - Armazens Gerais Frigorificos | 04/09/2002 | 05/06/2005 | |
| SIF 3673 | IFC - International Food Company Industria De Alim | 06/28/2005 | 05/27/2010 | |
| SIF 3712 | Marfrig Industria e Comercio de Alimentos Ltda. | 07/31/2007 | 05/27/2010 | |
| SIF 4238 | Marfrig Industria e Comercio de Alimentos S.A. | 03/03/2008 | 05/27/2010 | |
| SIF 4400 | Bertin S.A. | 11/26/2008 | 05/27/2010 | |

Decl. of B. Kershaw - 16

**USDA, Food Safety and Inspection Service**
**Brazil - Eligible Plants Certified to Export Meat to the United States**

| EstForgnNBR | EstName | DTListed | DTDeListed | DTRelisted |
|---|---|---|---|---|
| SIF 4490 | Vale Grande Industria e Comercio de Alimentos Ltda | 01/18/2008 | 07/31/2008 | |
| SIF 4507 | Bertin Ltda. | 08/12/2005 | 05/27/2010 | |
| SIF 4633 | Proquimio Produtos Quimicos Opoterapicos Ltda. | 05/01/2001 | 04/09/2002 | |

# EXHIBIT G

S-1/A 1 ds1a.htm AMENDMENT NO. 3 TO FORM S-1

**As filed with the Securities and Exchange Commission on January 4, 2010**

Registration No. 333-160739

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

Amendment No. 3

to

FORM S-1

**REGISTRATION STATEMENT**

*under*

*The Securities Act of 1933*

# JBS USA Holdings, Inc.

(Exact name of Registrant as specified in its charter)

| | | |
|---|---|---|
| **Delaware** | **2011** | **20-1413756** |
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**JBS USA Holdings, Inc.**
**1770 Promontory Circle**
**Greeley, Colorado 80634**
**(970) 506-8000**

(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

**André Nogueira de Souza**
**Chief Financial Officer**
**JBS USA Holdings, Inc.**
**1770 Promontory Circle**
**Greeley, Colorado 80634**
**(970) 506-8000**

(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| | |
|---|---|
| **Donald E. Baker** | **Arthur D. Robinson** |
| **John R. Vetterli** | **John C. Ericson** |
| **White & Case LLP** | **Simpson Thacher & Bartlett LLP** |
| **1155 Avenue of the Americas** | **425 Lexington Avenue** |
| **New York, New York 10036** | **New York, New York 10017** |
| **(212) 819-8200** | **(212) 455-2000** |

Approximate date of commencement of proposed sale to the public: As soon as practicable after this registration statement becomes effective.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933 check the following box: ☐.

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated

filer, or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☐ Accelerated filer ☐      Non-accelerated filer ☒      Smaller reporting company ☐
(Do not check if a smaller reporting company)

---

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

Decl. of B. Kershaw - 20

# Explanatory Note

This Amendment is being filed solely for the purpose of filing Exhibits 10.1.16 and 10.1.17. No change is made to the prospectus constituting Part I of the Registration Statement or Items 13, 14, 15, 16(b) and 17 of Part II of the Registration Statement.

# Part II

# Information not required in the prospectus

## Item 16. Exhibits and financial statement schedules.

The following Exhibits are filed as part of this Registration Statement.

**(a)  Exhibits:**

The attached exhibit index is incorporated herein by reference.

**(b)  Financial statement schedules.**

None.

II-1

Decl. of B. Kershaw - 21

# Signatures

Pursuant to the requirements of the Securities Act of 1933, the registrant has duly caused this amended Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Greeley, State of Colorado, on January 4, 2010.

JBS USA HOLDINGS, INC.

By:   /s/   WESLEY MENDONÇA BATISTA

Name:  **Wesley Mendonça Batista**
Title:   **Chief Executive Officer**

Pursuant to the requirements of the Securities Act of 1933, as amended, this amended Registration Statement has been signed by the following persons in the capacities and on the dates indicated:

| Signature | Title | Date |
|---|---|---|
| /s/   WESLEY MENDONÇA BATISTA<br>**Wesley Mendonça Batista** | President, Chief Executive Officer and Director (Principal Executive Officer) | January 4, 2010 |
| /s/   *<br>**André Nogueira de Souza** | Chief Financial Officer (Principal Financial Officer) | January 4, 2010 |
| /s/   *<br>**Joesley Mendonça Batista** | Director | January 4, 2010 |
| /s/   *<br>**José Batista Júnior** | Director | January 4, 2010 |
| /s/   WILLIAM GEORGE TRUPKIEWICZ<br>**William George Trupkiewicz** | Chief Accounting Officer | January 4, 2010 |

*By   /s/   WESLEY MENDONÇA BATISTA
**Wesley Mendonça Batista**
**Attorney-in-Fact**

Decl. of B. Kershaw -  22

# Exhibit index

| Exhibit number | Exhibit title |
|---|---|
| 1.1* | Form of Underwriting Agreement |
| 2.1** | Stock Purchase Agreement between Pilgrim's Pride Corporation and JBS USA Holdings, Inc. dated as of September 16, 2009 |
| 2.2** | Form of Stockholders Agreement between JBS USA Holdings, Inc. and Pilgrim's Pride Corporation |
| 2.3** | Plan Support Agreement between JBS USA Holdings, Inc. and Mr. Lonnie A. Pilgrim dated as of September 16, 2009 |
| 3.1* | Certificate of Incorporation of the Registrant, as currently in effect |
| 3.2* | Form of Amended and Restated Certificate of Incorporation of the Registrant, to be effective upon closing of the offering |
| 3.3* | Bylaws of the Registrant, as currently in effect |
| 3.4* | Form of Amended and Restated Bylaws of the Registrant, to be effective upon closing of the offering |
| 4.1* | Specimen Common Stock Certificate of the Registrant |
| 5.1* | Opinion of White & Case LLP |
| 10.1.1** | Indenture by and among JBS USA, LLC, JBS USA Finance, Inc., JBS USA Holdings, Inc., each of the other guarantors named therein, and The Bank of New York Mellon, dated April 27, 2009 |
| 10.1.2** | Indenture by and between JBS S.A., JPMorgan Chase Bank, N.A., The Bank of Tokyo-Mitsubishi UFJ, Ltd. and J.P. Morgan Bank Luxembourg S.A., dated August 4, 2006 |
| 10.1.3** | First Supplemental Indenture by and between JBS S.A., JBS Finance Ltd., Flora Produtos de Higiene e Limpeza Ltda., and The Bank of New York Mellon, dated January 31, 2007 |
| 10.1.4** | Second Supplemental Indenture by and between JBS S.A., JBS Finance Ltd., the Registrant, and The Bank of New York Mellon, dated September 6, 2007 |
| 10.1.5** | Third Supplemental Indenture by and between JBS S.A., JBS Finance Ltd., and The Bank of New York Mellon, dated August 14, 2008 |
| 10.1.6* | Revolving Loan Credit Agreement by and among JBS USA, LLC (formerly JBS USA, Inc.), the other credit parties signatories thereto, General Electric Capital Corporation, GE Capital Markets, Inc., Credit Suisse Securities (USA) LLC, Rabobank Nederland, JPMorgan Securities Inc. and JPMorgan Chase Bank, N.A., dated November 5, 2008 |
| 10.1.7* | Amendment No. 1 to Revolving Loan Credit Agreement, dated December 29, 2008 |
| 10.1.8* | Amendment No. 2 to Revolving Loan Credit Agreement, dated April 22, 2009 |
| 10.1.9* | Guaranty and Security Agreement by and among JBS USA, LLC (formerly JBS USA, Inc.), each other grantor party thereto and General Electric Capital Corporation, dated November 5, 2008 |
| 10.1.10* | Amended and Restated Credit Agreement by and among J&F Oklahoma Holdings Inc., Five Rivers Ranch Cattle Feeding, LLC, Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. "Rabobank Nederland", New York Branch, each of the banks or other lending institutions which is a signatory thereto, ING Capital LLC, Bank of America, N.A., US Bank National Association, and Wells Fargo Bank, National Association, dated October 7, 2008 |

| Exhibit number | Exhibit title |
|---|---|
| 10.1.11* | Second Amendment to Amended and Restated Credit Agreement by and among J&F Oklahoma Holdings Inc., Five Rivers Ranch Cattle Feeding LLC, each of the banks or other lending institutions which is a signatory thereto, and Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. "Rabobank Nederland", New York Branch, dated October 31, 2008 |
| 10.1.12* | Amended and Restated Security Agreement by and among J&F Oklahoma Holdings Inc., Five Rivers Ranch Cattle Feeding LLC, any subsidiary of J&F Oklahoma Holdings Inc. and/or Five Rivers Ranch Cattle Feeding LLC that may execute and deliver the Subsidiary Joinder Agreement, and Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. "Rabobank Nederland", New York Branch, dated October 7, 2008 |
| 10.1.13* | Consolidated, Amended and Restated Intercompany Loan Agreement dated April 27, 2009 by and between JBS HU Liquidity Management LLC and its Swiss branch, JBS HU Liquidity Management LLC Szombathely (HU) Zug Branch, and JBS USA Holdings, Inc. |
| 10.1.14* | Corporate Offer Letter, by and among Swift Australia (Southern) Pty Limited (formerly Tasman Group Services Pty Ltd A.C.N., Baybrick Pty Ltd, JBS Southern Australia Pty Ltd, JBS Southern Holdco Pty Ltd and NAB, dated May 2, 2008 |
| 10.1.15* | AUD120,000,000 Facilities Agreement, by and among Swift Australia Pty Ltd, the guarantors specified therein and Australia and New Zealand Banking Group Limited, dated February 26, 2008 |
| 10.1.16† | Raw Material Supply Agreement, by and between JBS USA Holdings, Inc. and Beef Products Inc., dated February 27, 2008 |
| 10.1.17 | First Amendment to Raw Material Supply Agreement entered into between JBS USA Holdings, Inc. and Beef Products Inc. on February 27, 2008, dated October 20, 2008 |
| 10.1.18* | Amended and Restated Promissory Note issued by JBS USA Holdings, Inc. in favor of NBPCO Holdings, LLC, in the amount of US$173,191,457.37, dated December 18, 2008 |
| 10.1.19* | Cattle Purchase and Sale Agreement by and between JBS USA, LLC and J&F Oklahoma Holdings Inc., dated October 23, 2008 |
| 10.1.20* | Cattle Supply and Feeding Agreement by and between Five Rivers Ranch Cattle Feeding LLC and J&F Oklahoma Holdings Inc., dated October 23, 2008 |
| 10.1.21* | JBS USA Holdings, Inc. 2010 Stock Incentive Plan |
| 10.1.22* | English translation of Shareholders' Agreement by and among BNDES Participações S.A.—BNDESPAR, J&F Participações S.A., ZMF Fundo de Investimento em Participações, and JBS S.A., dated December 22, 2009 |
| 10.1.23* | English translation of Investment Agreement among BNDES Participações S.A.—BNDESPAR, JBS S.A., J&F Participações S.A., ZMF Fundo de Investimento em Participações, and JBS USA Holdings, Inc., dated December 22, 2009 |
| 10.1.24* | Registration Rights Agreement between JBS USA Holdings, Inc. and BNDES Participações S.A.—BNDESPAR |
| 10.1.25* | Purchase and Sale Agreement between JBS S.A. and JBS USA Holdings, Inc. dated as of December 21, 2009 |
| 15** | Letter of BDO Seidman, LLP regarding unaudited interim financial information |
| 21** | List of subsidiaries of the Registrant |

| Exhibit number | Exhibit title |
| --- | --- |
| 23.1** | Consent of BDO Seidman, LLP |
| 23.2** | Consent of Grant Thornton LLP |
| 23.3** | Consent of Ernst & Young LLP |
| 23.4** | Consent of Deloitte & Touche LLP |
| 23.5** | Consent of Ernst & Young LLP |
| 23.6* | Consent of White & Case LLP (included in Exhibit 5.1) |
| 24** | Power(s) of attorney |

\*   To be filed by amendment.
\*\*   Previously filed.
†   Portions of these documents are expected to be omitted pursuant to a request by the Registrant for confidential treatment.

Certain debt instruments of the Registrant and its subsidiaries have been omitted as exhibits because the amounts involved in such debt instruments are less than 10% of the Registrant's total assets. Copies of debt instruments for which the related debt is less than 10% of the Registrant's total assets will be furnished to the Commission upon request.

# EXHIBIT H

EX-10.1.16 2 dex10116.htm RAW MATERIAL SUPPLY AGREEMENT

Exhibit 10.1.16

## RAW MATERIAL SUPPLY AGREEMENT

THIS RAW MATERIAL SUPPLY AGREEMENT (this "Agreement") is entered into this 27th day of February, 2008 by and between JBS USA, Inc., a Delaware corporation with a principal office at 1770 Promontory Circle, Greeley, CO 80634 and its affiliates and related entities (collectively, "Seller"), and Beef Products, Inc., a Nebraska corporation with its principal offices at 891 Two Rivers Drive, Dakota Dunes, SD 57049 ("Buyer").

### RECITALS

A. Seller is engaged in the business of producing, distributing and marketing fresh beef and pork products. Seller's current United States beef processing operations are located at Greeley, CO; Hyrum, UT; Grand Island, NE; and Dumas, TX and Seller is acquiring National Beef Packing Company, LLC's and its facilities at Dodge City, KS; Liberal, KS; and Brawley, CA as well as certain been processing facilities presently owned by Smithfield Foods, Inc. in Souderton, PA; Tolleson, AZ; Plainwell, MI; and Green Bay, WI (collectively, the "Locations").

B. Buyer is engaged in the business of producing, distributing and selling lean beef, pork and other meat products and currently has production facilities in Amarillo, Texas; Finney County, Kansas; Waterloo, Iowa; and South Sioux City, Nebraska. The majority of shareholders of Buyer, Eldon and Regina Roth, are also the owners of NBPCO Holdings, LLC. NBPCO Holdings, LLC is a member of National Beef Packing Company, LLC.

C. By virtue of the National Beef Packing Company, LLC operating agreement, Buyer purchases all of the beef trimmings containing less than 50% lean content produced at National Beef Packing Company, LLC's facilities. Seller's facilities also produce beef trimmings containing less than 50% lean content that comply with the specifications described in Exhibit B ("Raw Materials" or "XP Trim") attached to this agreement and incorporated by this reference.

D. Similarly, Buyer has certain Exclusive Supply Agreements in place for the Raw Materials produced at Seller's facilities in Grand Island, NE and Dumas, TX and from time to time purchases additional Raw Materials from Seller's facilities in Greeley, CO and Hyrum, UT.

E. Contemporaneously with this Agreement Seller, will enter into a certain agreement to purchase National Beef (the "Transaction"); however, NBPCO Holdings, LLC must consent to that transaction. NBPCO Holdings, LLC is willing to consent to such transaction contingent upon the execution of this Agreement with Buyer. Seller desires to sell, and Buyer desires to purchase, all of Seller's Raw Materials, under the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals (which are specifically incorporated herein by this reference) and the mutual covenants described below, the parties agree as follows:

1. Sale and Purchase of Raw Materials. Subject to the limitations below, Seller shall sell, and Buyer shall purchase, all of the Raw Materials that Seller can produce at the Locations. With the exception of the current supply agreements with Ed Minlat, Inc. and Jack-in-the-Box

(which shall not be renewed or the term otherwise extended beyond their respective current terms), Seller agrees that neither it nor any of its affiliates, subsidiaries, employees, officers, directors, agents, other related entities, or other entities or persons under Seller's actual or apparent control, shall directly or indirectly, produce for, supply to, or sell to anyone other than Buyer, any Raw Materials or otherwise use any Raw Materials for purposes competitive with Buyer's production of BPI® Boneless Lean Beef Trimmings. The parties acknowledge that Buyer may purchase Raw Materials from other suppliers provided that Buyer has purchased, or still purchases all of Seller's available Raw Materials under the terms of this Agreement. Notwithstanding anything in this Agreement to the contrary, the Seller shall be permitted to sell on a spot market basis, any Raw Materials that do not meet the Raw Material Specifications defined in Exhibit B and are rejected or refused by the Buyer to a third party.

   2. Quantity. As of the Effective Date, it is estimated that Seller will be able to produce the Raw Materials in the amounts indicated on Exhibit C for each facility. This production rate is only an estimate and Buyer shall accept any reasonable amount of Raw Materials. While Seller is under no obligation to produce any minimum quantity of the Raw Materials, certain terms and conditions relating to the Purchase Price (defined below) may vary based upon pound per head achieved or other volume and quality measurements for the Raw Materials.

   3. Purchase Price. The "Purchase Price" for the Raw Materials shall be calculated in accordance with the attached Exhibit A. Seller shall invoice Buyer each week for the Raw Materials delivered to and accepted by Buyer during the immediate preceding week. Buyer shall pay each invoice within 7 days after receipt of the applicable invoice.

      (a) If at any time during the terms of this Agreement, Buyer offers to purchase from a third party a product substantially similar to the Raw Materials provided under this Agreement at a price and on terms that are more favorable than the price and terms of this Agreement, then Buyer shall notify Seller in writing and Seller shall have the option to adjust the Purchase Price and the associated terms of this Agreement to be as favorable as what is offered to the third party. Notwithstanding the foregoing, Buyer shall have no obligations under this section unless such third party purchases the products on a contract basis in quantities greater than 40 loads per week.

   4. Shipments. Seller shall ship all the Raw Materials as soon as practicable following production of the Raw Materials in accordance with the customary past practice of the Parties. Shipments will be FOB the applicable Location with title passing upon Buyer's acceptance (provided such acceptance is accomplished promptly after delivery) of the applicable Raw Materials at Buyer's facility. Seller shall ensure that all of the Raw Materials are suitably packed and marked in accordance with the requirements of common carriers and the Raw Materials Specifications (defined below). All shipments are to be inspected by Seller prior to shipment to Buyer to provide reasonable assurances that such Raw Materials comply with the Raw Material Specifications. Buyer shall notify Seller if Buyer does not accept the Raw Materials and shall consult with Seller regarding the disposition of such Raw Materials. Such inspection by Buyer shall not waive Buyer's right to later reject such Raw Materials or pursue damages against Seller for Raw Materials that do not comply with Seller's warranties in Section 11.

2

5. _Specifications._ Seller represents and warrants that the Raw Materials shall comply with the specifications attached hereto as Exhibit B (the "Raw Material Specifications"), as amended from time to time based upon the mutual agreement of the parties. If Seller fails to comply with the Raw Materials Specifications the Buyer shall notify the Seller within 15 days of receipt of the Raw Materials. After receiving such notice, if the Seller fails to cure according to the terms of this Agreement than the Buyer, in addition to its other rights and remedies under the law, may also reduce the Purchase Price for the applicable Raw Materials accordingly by an equitable amount.

6. _Recoverable Costs._ Buyer and Seller have negotiated a separate packaging and collection charge for the Raw Materials. At the Inception of this Agreement, that charge will be $*** per pound. This charge shall be reviewed annually and adjusted as necessary (either up or down), with the goal to ensure that it closely approximates Sellers actual Recoverable Costs, as identified below. Recoverable Costs shall include the actual labor costs, including fringe benefits as defined below, for production workers involved with collection of the Raw Materials and other recoverable costs associated with the collection and packaging of the Raw Materials (as may be agreed upon by the parties) that Seller incurs specifically for the purpose of collecting and/or packaging the Raw Materials. In addition to labor costs, these costs may include equipment installation and other similar costs to be borne by Seller. Before inclusion as a Recoverable Cost, the parties will review and determine efficiency, and if installed, proper amortization schedule for inclusion in Recoverable Costs. Where actual costs are not reasonably available, Seller may use standard or estimated costs, subject to adjustment to actual costs at the end of each fiscal year. Seller agrees that expenses charged to Buyer shall be reasonably in kind and amount. Buyer shall have the right to reject any Recoverable Costs that are unreasonable (as determined by Buyer in its sole discretion).

The number of full-time employees utilized by Seller to produce the Raw Materials will vary by Location. The parties shall review the headcount and productivity for each Location on at least a quarterly basis.

Fringe benefits include, without limitation, company paid employment taxes, company paid health, life and disability insurance, workers compensation costs, vacation days, paid holidays, deferred compensation benefits/bonus contributions and other similar fringe benefits mutually agreed to, and consistent with fringe benefits of similar employees of Seller. For the convenience of the parties, the recovery for fringe benefits will be expressed as a percentage of the direct labor costs. Seller may vary the percentage figure used on a monthly basis as may be required from time to time to obtain full recovery. The dollar amount of the recovery of fringe benefits shall be determined by multiplying the labor costs of the hourly workers employed in the collection of Raw Materials by a fraction, the numerator of which is the total fringe benefits costs for Seller's applicable Location and the denominator of which is the total direct labor cost for the applicable Location. In the event of a significant unexpected increase in benefit costs, the parties will engage in good faith re-negotiation to ensure the aims and purposes of this Agreement are being met.

Notwithstanding the provisions of this Section 6, in no event will the employees of Seller be deemed to be employees of Buyer for any purpose.

*** Omitted pursuant to a confidential treatment request. The confidential portion has been filed separately with the SEC.

3

7. <u>Ownership and Use of the Equipment</u>. Buyer has, and from time to time during the term of this Agreement may, install certain equipment at one or more of the Locations in order to facilitate the production of the Raw Materials by Seller and delivery of the Raw Materials to Buyer (the "Equipment"). Seller may use the Equipment for that purpose without any royalties or fees owed to Buyer, but agrees to maintain the Equipment in working condition at Seller's expense. Title and risk of loss of the Equipment shall at all times remain with Buyer. Upon the termination of this Agreement, Buyer shall remove the Equipment from any and all Locations at Buyer's expense within 90 days after the effective date of such termination, or such longer period of time as reasonably necessary to remove the Equipment. After the termination of this Agreement, Seller shall continue to have the right to use the Equipment without owing any royalties or fees to Buyer (except that it shall pay for any maintenance or repair costs Seller incurs) until the Equipment is removed by Buyer. Seller shall not charge any warehousing or other storage fees for the Equipment during the term or thereafter.

8. <u>Noncompetition, Nonsolicitation, Noninterference</u>. Seller shall not during the term of this Agreement and for 3 years thereafter (the "Restrictive Period"), directly or indirectly: produce, manufacture, promote, sell or distribute any product from Raw Materials that competes with the Buyer's production of BPI® Boneless Lean Beef Trimmings. During the Restrictive Period, Buyer shall not hire, attempt to hire or contact or solicit with respect to hiring any employee of the Seller with out the Sellers prior consent. If this agreement terminates prior to the closing of the Transaction all the terms and conditions contained in this paragraph shall be of no further force and effect.

The Parties acknowledges that the covenants and restrictions contained in this Section 8 are necessary, fundamental and required for the protection of each party and the goodwill of each Party; and relate to matters which are of a special, unique and extraordinary character that gives each of the covenants and restrictions a special, unique and extraordinary value. The Parties also acknowledge that a breach of any covenant or restriction contained in this Agreement will result in irreparable harm and damage to the other Party. Accordingly, each Party expressly agrees that, in the event of a breach or threat of a breach of any provision of this Section 8 by the other Party, their remedies at law will be inadequate and in each such event, they will be entitled to an injunction or other similar relief to prevent any breach of this Section 8 and to enforce specifically the provisions of this Section 8 in addition to money damages sustained resulting from the breach or threatened breach of this Section 8, and in addition to any other remedy to which they may be entitled at law or in equity. If either Buyer or Seller institutes legal action to enforce the provisions of this Section 8, in addition to any and all other rights and remedies which the prevailing party may obtain in any such litigation, the prevailing party shall also be entitled to recover from the other party its reasonable attorneys' fees and out-of-pocket expenses incurred in such litigation.

9. <u>Review of Books and Records</u>. Each Party shall keep accurate records of all its activities as reasonably necessary to determine compliance with the terms and conditions of this Agreement, including accounting records, production records and any mandatory governmental filings. Without limiting either party's rights or obligations under Section 9, during the term of this Agreement and for a period of 2 years thereafter, each party shall have the right to inspect such records upon 5 days' prior written notice to the other.

4

10. <u>Inspection</u>. Buyer may (but is not obligated to) inspect the equipment, factories and other facilities of Seller in order to ensure compliance with the terms and conditions of this Agreement at commercially reasonable times during the term of this Agreement and upon 5 days' notice to Seller, provided however, that such inspection shall not unreasonably interfere with Sellers business and shall occur only during normal business hours.

11. <u>Seller's Warranties</u>. Seller warrants that: (a) it has full power and authority to enter into this Agreement and to perform its obligations hereunder and that its performance of this Agreement will not violate any agreement between Seller and any other third person; (b) the Raw Materials will meet or exceed the Raw Material Specifications in effect as of the date the Raw Materials are shipped to Buyer and shall comply with the provisions of the Seller's standard food guaranty which shall be provided to the Buyer contemporaneously with the execution of this Agreement; and (c) the Raw Materials will be free and clear of all liens and encumbrances. SELLER MAKES NO OTHER WARRANTY, EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE WARRANTIES OF MERCHANTABILITY OR SUCH FITNESS OF THE PRODUCTS FOR ANY PARTICULAR PURPOSES EVEN IF SUCH PURPOSES ARE KNOWN TO SELLER.

12. <u>Term</u>. The initial temporary term of this Agreement shall commence upon the signing of the Membership Interest Purchase Agreement ("MIPA") for the Transaction and shall continue until Closing of the Transaction (the "Initial Term"). This Agreement shall terminate upon the termination or expiration of the MIPA or in the event the Transaction does not close. Unless sooner terminated, the primary term of this Agreement shall be for a period of 15 years commencing upon the closing of the Transaction ("Effective Date"); provided, however, that this Agreement will automatically renew for successive 1 year periods unless either party notifies the other, no later than 6 months prior to any renewal date, that it desires to terminate this Agreement as of such date. This Agreement may be terminated earlier (a) by written agreement of the parties; or (b) by either party if the other party materially breaches in any manner and does not cure such breach within 60 days after it receives notification thereof from the non-breaching party or (c) if the Buyer fails to fund that certain Promissory Note executed contemporaneously with this Agreement.

13. <u>Compliance with Laws</u>. Each party aggress that it will neither undertake nor cause to be undertaken in its performance under this Agreement any action or omission that is illegal under the laws of the USA or the laws of any other applicable governmental authority. Each party shall comply with any requirements for the transaction registration or the submission or recording of this Agreement with applicable governmental entities after providing notice of the same to Buyer. Each party agrees that it will not, directly or indirectly, offer, pay, promise to pay or authorize the payment of any money or thing of value to any official, party or candidate, or to any person, while knowing or having reason to know that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to any official, party or candidate, for the purpose of: (a) influencing any act or decision of such official, party or candidate, including a decision to fail to perform his official functions; or (b) inducing such official, party or candidate, to use his influence with the government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, in order to assist Buyer in obtaining or retaining business for or with or directing business to, any person.

5

14. <u>Remedies</u>. The Parties hereto acknowledge that compliance with this Agreement is necessary to protect their respective business and a breach of this Agreement will irreparably and continually damage the other Party or which money damages may not be adequate. In addition, the Parties agree that in the event of a breach or threatened breach to this Agreement, the non-breaching party shall be entitled to (a) an injunction to prevent the continuation of such harm, the money damages insofar as they can be determined and (c) reasonable attorneys fees and costs. Nothing in this Agreement, however, shall be construed to prohibit the non-breaching party from also pursuing any other remedy, the parties having agreed that all remedies shall be cumulative.

15. <u>Confidentiality</u>. During the term of this Agreement, each party (the "Disclosing Party") may provide the other (the "Receiving Party") with certain confidential and proprietary information ("Confidential Information"). Confidential Information includes, but is not limited to, the terms and conditions of this Agreement, all business, financial and technical trade secrets, current, or future products, production and marketing plans and volume, equipment (including equipment designed by other companies affiliated with Buyer), processes and facilities of the parties, any written information which is marked "Confidential" and any information which is orally disclosed, identified as confidential at the time of disclosure and confirmed in writing as being confidential within 30 days thereafter. However, "Confidential Information" will not include information that (a) is publicly known at the time of its disclosure; (b) is lawfully received by the Receiving Party from a third party not under an obligation of confidentiality to the Disclosing Party; (c) is published or otherwise made known to the public by the Disclosing Party; or (d) was generated independently by the Receiving Party before disclosure by the Disclosing Party. The Receiving Party will refrain from using the Disclosing Party's Confidential Information except to the extent necessary to exercise its rights or perform its obligations under this Agreement. The Receiving Party will likewise restrict its disclosure of the Disclosing Party's Confidential Information to those who have an absolute need to know such Confidential Information in order for the Receiving Party to perform its obligations and enjoy its rights under this Agreement. Such persons will be informed of and will agree to the provisions of this Section 15, and the Receiving Party will remain responsible for any unauthorized use or disclosure of the Confidential Information by any of them. The Receiving Party may also disclose Confidential Information pursuant to the requirement or request of a governmental agency, a court or administrative subpoena or any order or other legal process or requirement of law so long as it shall (x) first notify the Disclosing Party of such request or requirement; (y) in the case of a required disclosure, furnish only such portion of the Confidential Information as it is advised in writing by counsel that is legally required to disclose; and (z) cooperate with the Disclosing Party in its efforts to obtain an order or other reliable assurance that confidential treatment be accorded to that portion of the Confidential Information that is required to be disclosed. Upon the termination of this Agreement for any reason, each party will return (or, if requested, destroy) the Confidential Information (including any and all copies and derivatives thereof) of the other party provided pursuant to this Agreement. Upon a party's written request, an authorized officer of the other party will certify in writing that this Section 15 has been complied with by such other party.

16. <u>Insurance</u>. Buyer shall maintain liability and other insurance appropriate for its business, including comprehensive general liability and product liability insurance with minimum limits of $5 million per occurrence, an aggregate of $10 million (with the other party

6

reserving the right to request reasonable increases in such limits upon 90 days' prior notice). All such insurance is to be purchased from reputable, duly qualified insurance companies (at least A-rated), and such insurance is to be maintained during the term of this Agreement and for a minimum of 12 months thereafter. Buyer agrees to (a) furnish the other party with certificates of insurance properly executed by such party's insurance company evidencing such insurance; (b) include the other party as an additional insured; and (c) give the other party at least 30 days' prior notice of any cancellation or material alteration of such insurance coverage.

17. <u>Indemnification</u>. Each party (the "Indemnifying Party") agrees to indemnify and hold the other party (the "Indemnified Party") harmless from and against any and all damages, claims, losses and reasonable costs and expenses (including reasonable attorneys' fees) incurred by the Indemnified Party as a result of any claim, action, recall, suit, proceeding or investigation filed or threatened by the government, customer or any other third party (collectively, a "Claim") to the extent such a Claim arises out of the breach of any of the representations, warranties or obligations made or assumed by the Indemnifying Party pursuant to this Agreement. This indemnification provision shall survive for the applicable statute of limitations period for the applicable claim. The Indemnified Party shall notify the Indemnifying Party immediately of any claim for which it believes may be entitled to indemnification hereunder.

18. <u>Independent Contractors</u>. Buyer and Seller are independent contractors, and neither of the parties is the legal representative or agent of the other party for any purpose whatsoever, and neither of the parties has any right or authority to assume or create any obligation express or implied on behalf of the other party or to bind it in any respect whatever. Nothing in this Agreement shall be deemed to create a partnership relationship between Buyer and Seller to make either of the parties jointly liable with the others for any obligation arising out of the activities contemplated by this Agreement. Buyer and Seller will each be solely responsible for the direction and control of the work of its own employees, and each will assume complete responsibility for the personal safety of its respective employees.

19. <u>No Third Party Beneficiaries</u>. Nothing in this Agreement is intended, or shall be construed, to give any person other than the parties hereto any legal or equitable right, remedy or claim under or in respect of this Agreement or any of the provisions contained herein.

20. <u>Assignment</u>. This Agreement may not be assigned or transferred by either Party by operation of law, a change of control event (e.g., a merger, acquisition, reorganization, sale of substantially all the assets or stock of Seller or any similar event) or otherwise without the express written consent of the other Party. Any purported assignment in violation of the preceding sentence shall be void and of no effect. This Agreement shall be binding upon the parties' respective successors and permitted assigns. Notwithstanding the foregoing, either Party may transfer this Agreement to any subsidiary and affiliate provided that the assigning party remains liable for all of its obligations under this Agreement.

21. <u>Change in the Locations</u>. During the term of this Agreement, Seller shall make a good faith effort as part of the sale of any of its Locations, to encourage the new owner of the applicable Location to enter into a new agreement with Buyer under similar terms and conditions as this Agreement. Provided however, nothing herein shall obligate the Seller to expend any money, or make any representation, or covenant obligation to such new owner.

7

Decl. of B. Kershaw - 33

22. <u>Right of First Offer</u>. In the event that Seller acquires, builds, purchases or otherwise operates a new beef processing operation (an "Additional Location"), it shall promptly notify Buyer of the Additional Location and offer Buyer a right to first offer to add such Additional Location as a "Location" under the terms and conditions of this Agreement. Provided, however, that if such Additional Location is owned by a party that also owns an operation that competes with Buyer and the acquisition is conditioned upon Seller continuing to sell Raw Materials to that owner, then such Additional Location will be excluded from Seller's first offer obligations. Buyer shall have 3 months from the date of receiving notice of such offer from Seller, to accept such offer.

23. <u>Construction</u>. "Including" means "including without limitation" and does not limit the preceding words or terms. The words "or" and "nor" are inclusive and include "and". Whenever the context shall require, each term stated in either the singular or plural shall include the singular and the plural, and masculine or neuter pronouns shall include the masculine, the feminine and the neuter. All references to dollar amounts shall be in United States dollars. References to "Sections" or "Exhibits" shall mean the Sections of this Agreement or Exhibits attached to this Agreement, unless otherwise expressly indicated. The headings or titles preceding the text of the Sections are inserted solely for convenience of reference, and shall not constitute a part of this Agreement, nor shall they affect the meaning, construction or effect of this Agreement. Both parties have participated in negotiation and drafting of this Agreement. This Agreement is executed in the English language and may be translated into Portuguese or another language for informational purposes only. In the event an ambiguity or question of intent of interpretation arises, the English version of this Agreement shall prevail and this Agreement shall be construed as if drafted by both of the parties and no presumption or burden of proof shall arise favoring or disfavoring either party by virtue of the authorship of any of the provisions of this Agreement. This Agreement shall not be supplemented or modified by any course of dealing or trade usage.

24. <u>Notices</u>. Except as otherwise provided in this Agreement, any notice, consent or other communication required or permitted hereunder shall be written in English and shall be deemed given when (a) delivered personally; (b) sent by confirmed facsimile transmission; or (c) sent by commercial courier with written verification of receipt returned to the sender. Rejection or other refusal to accept or the inability to deliver because of changed address of which no notice was given shall be deemed to constitute receipt of the notice or communication sent. Names, addresses and facsimile numbers for notices (unless and until written notice of other names, addresses and facsimile numbers are provided by either or both parties) are as follows:

If to Seller, to:

    JBS USA
    Attn: General Counsel
    1770 Promontory Circle
    Greeley, CO 80634
    Facsimile (970) 506-8323

If to Buyer, to:

    Beef Products, Inc.
    Attn: General Counsel
    891 Two Rivers Drive
    Dakota Dunes, South Dakota 57049
    Facsimile: (605) 217-8001

8

Decl. of B. Kershaw - 34

25. <u>Choice of Law and Venue</u>. This Agreement shall be governed by and construed under the laws of the State of Nebraska, without regards to conflicts of law principles; provided, however, the parties agree that the United Nations Convention on contracts for the International Sale of Goods shall not be used to govern or construe this Agreement. Each party expressly consents to the exclusive jurisdiction of the federal, state and local courts serving Douglas County, Nebraska, to govern all disputes arising out of this agreement.

26. <u>Force Majeure</u>. Neither Party shall be deemed to have defaulted or failed to perform under this Agreement if that Party's ability to perform or default shall have been caused by an event or events beyond the control and without the fault of that Party, including fire, flood, explosion, act of God or a public enemy, strike, labor dispute, civil riot, the inability to procure necessary raw materials, supplies, or equipment for the production, storage and/or delivery of the Raw Materials, or if the ability of the Seller to produce the Raw Materials is impacted by any of the foregoing ("Force Majeure Event"). Upon the occurrence of the Force Majeure Event, the Party claiming the Force Majeure Event shall notify the other Party in writing within ten (10) days of such event and, to the extent possible, inform the other Party of the expected duration of the Force Majeure Event and the quantity of Raw Materials to be affected by the suspension or curtailment of this Agreement. Notwithstanding this provision, nothing contained in this Agreement shall relieve the purchaser of the Raw Materials of the obligation to pay in full the purchase price for any amounts due for the Raw Materials delivered and received hereunder. The Seller shall not be obligated to make up delivery of the Products that have been prevented by a Force Majeure Event.

27. <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or incapable of being enforced by any rule or law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect without regard to the invalid, illegal or unenforceable term or provision. If the courts of any one or more jurisdictions shall hold all or any part of such term or provision wholly unenforceable by reason of the breadth of such scope or otherwise, it is the intention of the parties that such determination shall not bar or in any way affect other party's right to relief in the court of any other jurisdiction as to failures to observe such term or provision in such other jurisdictions, the above provisions as they relate to each jurisdiction, being, for this purpose, severable into diverse and independent provisions.

28. <u>Waiver</u>. No right of either party under this Agreement, may be waived except as expressly set forth in writing signed by an authorized representative of the party waiving such right. No waiver of any provision shall be implied by a party's failure to enforce any of its rights or remedies herein provided, and no express waiver shall affect any provision other than that to which the waiver is applicable and only for that occurrence.

29. <u>Entire Agreement</u>. This Agreement, including all of the Exhibits attached hereto (all of which are incorporated herein by this reference), contains the entire agreement of the parties with respect to the subject matter hereof and will supersede and replace any and all other prior or contemporaneous agreements and understandings between the parties, whether written or oral, regarding the subject matter hereof. Any modifications, revisions or amendments to this Agreement must be set forth in a writing signed by authorized representatives of both parties.

9

30. <u>Survival</u>. Provisions of this Agreement which are either expressed to survive its termination or, from their nature or context it is contemplated that they are to survive such termination, shall remain in full force and effect notwithstanding such termination.

10

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date indicated below.

Beef Products, Inc.                                JBS USA

By:   /s/ Eldon Roth                              By:   /s/ Wesley Mendonça Batista

Title: President                                  Title: Chief Executive Officer

Date: 2/27/2008                                   Date: February 26, 2008

http://www.sec.gov/Archives/edgar/data/1467955/000119312510000220/dex10116.htm          12/20/2010

Exhibit A

Raw Materials Price Calculation

The "Purchase Price" shall be determined in accordance with the following formula:

A = Moisture content of the Raw Material, expressed as a decimal fraction.

B = Fat content of the Raw Material, expressed as a decimal fraction.

C = Protein content of the Raw Material, expressed as a decimal fraction.

X = Tallow price – prior week's weighted average price less freight.

Y = Meal price – prior week's weighted average price.

> 1.00 - (A + B) = solids content of the Raw Materials (S)
>
> $\frac{S}{***}$ = predicted meal yield (M)
>
> *** = fat content of meal (F)
>
> B - F = predicted tallow yield (T)
>
> $\frac{C}{M}$ = protein percentage of meal product (P)
>
> TX = tallow value (V)
>
> M(PY/2000) = meal value (V)
>
> M(1700 BTU/#) [gas cost ($/MBTU)] = energy cost credit (E)
>
> V + V + E = Raw Materials Value

These calculations will derive at Raw Materials Price based upon predicted rendered Meat Product yields from the Product. With inputs of analyses and rendered product prices, a gross value is calculated. From this is subtracted an incremental costs of drying the meal (one pound of water evaporated per pound of meal product).

In addition, a premium will be paid based upon the Lean Based Premium Schedule which is attached hereto as Schedule 1 and incorporated herein by this reference, as adjusted, based on volume (pounds per head).

> ○ @ Target lb/hd – pay at proposed premium schedule
> ○ @ Target less 5 lb/hd – pay premium schedule less $***
> ○ @ Target less 10 lb/hd – pay premium schedule less $***
> ○ @ Target less 20 lb/hd – pay premium schedule less $***
> ○ @ Target less 30 lb/hd – pay premium schedule less $***

*** Omitted pursuant to a confidential treatment request. The confidential portion has been filed separately with the SEC.

○ @ Below minimum lb/hd – pay no premium

In addition, a negotiated Packaging and Collection charge will be paid based on Seller's Recoverable Costs as defined in this Agreement.

This Raw Materials Price Calculation may be modified from time to time by the written consent of both parties. In addition, certain components like the tallow freight adjustment, energy cost credit, and lean based premium schedule will be reviewed on a semi-annual basis. Recoverable Costs will be reviewed at least annually.

13

Exhibit B

RAW MATERIALS SPECIFICATIONS

January 25, 2007

Only raw materials supplied from USDA/FSIS inspected beef slaughter and processing facilities or facilities operating under an equivalent inspection program may be used in the production of BPI products. Raw material suppliers are required to have written HACCP plans, SSOPs, or other prerequisite programs necessary to ensure raw materials supplied to BPI meet all applicable food safety regulatory requirements and other criteria, including but not limited to the specifications below. HACCP plans, SSOPs, and other programs must be available for BPI review upon request. BPI may also request to visit supplying facilities to review these records along with a review of the operations. In addition, suppliers must have a documented, functioning food defense program.

HACCP plans must contain at least one, but preferably more critical control points (CCPs), validated to eliminate or to reduce *E.coli* O157:H7 below the detectable levels. Raw material suppliers are required to update BPI upon supplementation of additional CCPs or other material changes to their HACCP plans. Continued use of CCPs identified by raw material suppliers will comply with these specifications will be confirmed annually.

If raw material supplier is a processing establishment that utilizes outside carcasses or raw materials, supplier must confirm that its raw material suppliers have HACCP plans, SSOPs, or other prerequisite programs in place consistent with the requirements above. Raw material suppliers will maintain records of purchase source or slaughter plant to allow trace back of raw materials in the event of a recall.

BPI will not currently require raw material suppliers to sample product and test for the presence of *E.coli* O157:H7 other than as noted below, assuming the following criteria are met. If these criteria are not met, BPI reserves the right to require sampling/testing of all raw materials sold to BPI and also reserves the right to conduct its own sampling/testing of all incoming raw materials. Those criteria are:

1. Existence of one or more validated CCPs in use by supplier;

2. Raw material supplies consistently meet the performance specifications below;

3. Raw material supplier participates in quarterly verification sampling/testing with BPI; and

4. BPI continues finished product sampling/testing program and holds product pending negative test result for *E.coli* O157:H7.

With the exception of *E.coli* O157:H7, which is an adulterant and must not be present in any raw materials supplied to BPI, the following specifications will be reviewed and reports may be provided to raw material suppliers for trending purposes only. BPI may choose certain safeguards when supplier's trends are out of specification, such as accelerated sampling, product segregation, process using additional interventions, implementation of alternate pricing for supplier raw materials, or others.

✓ Total plate count          <100,000 cfu/gram

| | | |
|---|---|---|
| ✓ | E.coli | <100 cfu/gram |
| ✓ | Coliform | <100 cfu/gram |
| ✓ | Staphylococcus aureus | <100 cfu/gram |
| ✓ | Listeria monocytogenes | Negative |
| ✓ | Salmonella | Negative |
| ✓ | *E.coli* O157:H7 | Negative |

On a quarterly basis, on dates established by BPI, a lot of five randomly chosen combos will be sampled/tested for the presence of *E.coli* O157:H7 using sampling and testing methods established by BPI. The purpose of this quarterly sampling/testing is to verify the continued effectiveness of the CCPs employed by raw material suppliers. If a verification sample is found to be positive the lot tested will be destroyed and the originating supplier will be immediately contacted to conduct a review of policies and programs. BPI may request a documented response of the findings of this review.

Acceptable Products

All raw materials shall be free from defects as identified in the "Boneless Beef AQL" criteria established under subpart 18-b of the USDA MPI Manual. All raw materials must have a minimum chemical lean of ***%. The product should be free of all specified risk material as defined in 9 CFR 310.22 or Annex XL Section A to Regulation (EC) No. 999/2001, contamination (including ingesta, grease, rail dust, etc. and foreign objects).

All raw materials must meet the following requirements:

1. Be produced from only young, fed cattle in compliance with Title 21 CFR, Part 589.2000 addressing feeding bins as measures to control BSE. No raw materials from cows, bulls, or other classifications of raw materials unless supplier is participating in a BPI pre-approved segregation program, in which combos and load manifest are to be clearly identified.

2. SRM materials identified in 9 CFR 310.22 are not allowed in any product destined for BPI and must be disposed of in accordance with 9 CFR 314.1 or 314.3.

3. No fresh raw materials will be delivered to BPI's facility more than 5 days from their cut date, nor more than 10 days from date of slaughter without advance approval of BPI Quality Assurance department.

4. Without advanced approval, the facility may not use chemical sprays, including hyperchlorinated water, organic acids (unless part of an approved BPI quality control program), or alginate coating, in any of its processes.

5. The establishment must have an active "Downer" policy that prohibits the fabrication of downer carcasses. A downer carcass includes any animal that is unable to enter or exit a trailer/truck under its own power (subject to USDA-FSIS guidelines as outlined in 69 Federal Register 1862, et seq).

6. The establishment must demonstrate GMP, Food safety, and humane handling practices consistent with industry standards. If requested, the establishment will provide BPI with a review of recently conducted third party audits.

7. Each raw material combo may contain product from only one (1) production or cut date. Partial combos will not be carried over to the next production date to be filled out with additional production.

***    Omitted pursuant to a confidential treatment request. The confidential portion has been filed separately with the SEC.

8.  Suppliers must have a documented pest control program.

9.  Suppliers must comply with APHIS rev. January 2002 and USDA safeguards measures against Foot and Mouth Disease.

10. Raw materials must be free of illegal residues such as antibiotics, hormones and agricultural chemicals as set forth in 1997 by USDA and APHIS.

11. Free of foreign materials as defined by FSIS Directive 7310.5.

**Fresh Raw Material Acceptable** carcass portions:

1.  Flank fat – fat from the flank area of the carcass with traces of lean;

2.  Bottom butt fat – kernel of tri-tip with traces of lean;

3.  Chuck fat – fat associated with the break down of the chuck;

4.  Loin wing cap – fat portion with traces of lean;

5.  Rib cap – fat portion with traces of lean;

6.  Any small pieces of fat derived from the normal breakdown of the beef carcass.

**Fresh Raw Material Non-acceptable** carcass portion:

1.  Bones of <u>any</u> kind;

2.  Cartilage (unless specifically approved);

3.  Tunic tissue (unless specifically approved);

4.  Kidney knob fat (unless specifically approved);

5.  Material from the bone cannons, mechanically deboned meat or materials from advanced meat recovery systems;

6.  Spinal cords, any central nervous system materials, dorsal root ganglia, or other specified risk materials identified by USDA in 9 CFR 310.22[1];

7.  Catch pan materials;

8.  Foreign objects, hair, ingesta, bruises, or abscesses;

9.  Mammary tissue.

Mammary tissue is any brownish or off colored covering on the flank fat from heifer carcasses. This substance must be trimmed out of the product, to leave only incidental traces behind. The trimming should be taken to the depth that the mammary tissue appears freckled among the fat. "Incidental" means any mass smaller than a dime. **Combos containing mammary tissue by this definition with be rejected.**

**BPI will notify the originating supplier upon identification of a non-compliance. BPI may request reasonable appropriate corrective actions and preventive measures addressing these non-compliances.**

Packaging

Fresh raw materials are to be packed into a 40x48x54-inch or taller combo lined with a poly liner. Poly liners should be securely attached to the combos with filament tape to prevent the liner from slipping during the filling process. Combos should be placed on good quality 40x48-inch pallets and should not have top or bottom boards missing or broken. Board nails should not be exposed in order to limit the possibility of puncture through the combo and liner, or from falling into product during dumping of the combo.

---

[1]  Supplier shall continue efforts to put in place product flows and segregation plans to ensure that specified risk materials do not become commingled with raw materials provided to BPI at any stage of the production process.

16

http://www.sec.gov/Archives/edgar/data/1467955/000119312510000220/dex10116.htm    12/20/2010

When applicable, trimmings are to be packed into a plastic BPI combo lined with a poly liner. Poly liners should be securely attached to the combos with filament tape to prevent the liner from slipping during the filling process. The plastic BPI combo should be in sound shape, being free from any cracks or chips. The plastic BPI combos should be washed and sanitized before filling with product.

> Combos are to have a combo cap securely attached and covering the entire top of the combo as to prevent possible contamination during transport.

Combo liners are to be 4 mil. thick or greater, or exhibit comparable tear strength. The combo liners will preferably be blue, but may be such other color sufficiently distinct from the color of the raw material to allow liner to be easily identifiable from the raw materials.

Combos should be filled to a target weight of 2,200 lbs gross weight when possible. Once filled, the combo should be covered with a poly cap that is securely attached to the sides of the combo. Any combos that are torn, punctured, or tearing should be reworked. **GROSS** trailer weight should not fall below 44,000 lbs, with a **NET** weight of approximately 40,000 lbs.

> Labeling

Combos should be properly labeled with the following information:

- ✓ Product label, labeled appropriately as trimmings according to contents as approved by USDA;
- ✓ Gross weight – includes tare and net weight; a separate gross weight will be listed to include dry ice tare;
- ✓ Tare weight including pallet, combo liner, and cover weights (not including dry ice)
- ✓ Tare weight of dry ice, listed separately (if applicable)
- ✓ Net weight – weight of the product only;
- ✓ Date of production;
- ✓ Combo sequence number per shift and shift ID
- ✓ Manifest number
- ✓ When using BPI plastic combos, labels are to be attached to liner of the combo, not the plastic combo
- ✓ When applicable, BEV compliant product should be appropriately labeled and be accompanied by necessary supporting documentation;
- ✓ When applicable materials must be labeled as domestic only product in compliance with USDA AMS programs.

> Trailer Loading

Combos should be placed in the trailer in a manner so that the face of the combo is toward the rear of the trailer. In the event that a combo is staged by itself in a row, support should be placed beside it to prevent the combo from tipping or falling during transit.

17

Decl. of B. Kershaw - 43

A load manifest should be attached to the Bill of Lading, and given to the driver. Another copy of the manifest should be attached in a packing slot at the rear of the trailer. The load manifest should include the following information:

- ✓ Sales order number and purchase order number;
- ✓ Trailer number and carrier;
- ✓ Product code of each combo;
- ✓ Production date of each combo;
- ✓ Combo number of each combo;
- ✓ Manifest number of each combo;
- ✓ Gross weight of each combo;
- ✓ Net weight of each comb;
- ✓ Tare weight of each combo.

The refer unit should be set at a temperature of 20° F during summer months, and 28° F during the winter months for fresh raw materials. All changes to these set points will be coordinated through the BPI Traffic Coordinator or designee.

### Dry Ice & Receiving Temperatures

Dry ice should be added either manually or automatically to fresh raw materials so that approximately 50 lbs of $CO_2$ is incorporated into each combo at a minimum of three (3) proportional locations (eg 500, 1,000, 1,500 lb increments). The amount and tare of dry ice may vary depending on the type of $CO_2$ used and time of year. Receiving temperatures at the processing facilities for fresh raw materials shall not exceed 45° F.

18

Decl. of T. Ennis - 44

Exhibit C

## RAW MATERIAL VOLUMES AND LEAN UPGRADE MATRIX

The parties are targeting an overall average raw material supply from the National/JBS facilities of at least \*\*\* lb/head. That average will vary over time depending upon a number of factors, including carcass weights, carcass grades, supplier product mix, and other characteristics. In addition, those factors are often influenced by market and other considerations as well. Still, based upon experience of each at the facilities listed below, the parties have established the following target and minimum quantities for each facility.

| Location | Minimum | Target |
|---|---|---|
| Brawley, CA | \*\*\* | \*\*\* |
| Cactus/Dumas, TX | \*\*\* | \*\*\* |
| Dodge City, KS | \*\*\* | \*\*\*+ |
| Grand Island, NE | \*\*\* | \*\*\*+ |
| Greeley, CO | \*\*\* | \*\*\*+ |
| Hyrum, UT | \*\*\* | \*\*\*+ |
| Liberal, KS | \*\*\* | \*\*\*+ |

The parties will meet and/or discuss routinely the minimum target quantities above and facility performance relative to the same, taking into consideration the lean upgrade matrix/example below:

Market and Processing Assumption

50s – $\*\*\*/lb

75s – $\*\*\*/lb

85s – $\*\*\*/lb

XF – $\*\*\*/lb

Cost to upgrade is $0.10/lb

75s upgrade potential of 50s

➢   \*\*\*% upgrade to 75s

➢   \*\*\*% convert to XF

➢   Advantage to upgrade is $\*\*\*/lb (\*\*\*)

➢   So, every 100 lbs of 50s upgraded to 75s generates $\*\*\*

85s upgrade potential of 50s

➢   \*\*\*% upgrade to 85s

➢   \*\*\*% convert to XF

➢   Advantage to upgrade is $\*\*\*/lb (\*\*\*)

So, every 100 lbs of 50s upgraded to 85s generates $\*\*\*

During the Initial Term (and prior to the Effective Date) of this Agreement the Parties will negotiate in good faith mutually acceptable Raw Material Volumes for Raw Materials originating from the facilities located in Souderton, PA; Tolleson, AZ; Plainwell, MI; and Green Bay, WI

---

\*\*\*   Omitted pursuant to a confidential treatment request. The confidential portion has been filed separately with the SEC.

## SCHEDULE 1

### LEAN BASED PREMIUM SCHEDULE

JBS Premium Schedule (1-23-08)

***

***    Omitted pursuant to a confidential treatment request. The confidential portion has been filed separately with the SEC.