1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9
10

OBERTO SAUSAGE COMPANY,

No. C10-2033 RSL

Plaintiff,

v.

ORDER GRANTING PLAINTIFF'S
MOTION FOR PRELIMINARY
INJUNCTION

JBS S.A.,

Defendant.

## I.    INTRODUCTION

This matter comes before the Court on plaintiff Oberto Sausage Company's motion for preliminary injunction.  Dkt. #5.  After considering the memoranda, all supporting evidence submitted to the Court, and oral argument, the Court GRANTS plaintiff's motion for preliminary injunction for the reasons stated below.

## II.    BACKGROUND

Plaintiff is one of the oldest, continuous manufacturers of natural-style jerky in the country.  Dkt. #6 (Ennis Decl.) ¶2.  Plaintiff has maintained a research and development department since its inception.  Dkt. #9 (Tull Decl.) ¶3.  The research and development department is primarily responsible for product innovation, developing new products, improving existing products, and developing new and more efficient production methods that

ORDER GRANTING PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 1

improve flavor and aroma, preservation, assembly, and package design.  Id.  Plaintiff considers specific details about its products and manufacturing processes as highly proprietary and trade secret.  Id. ¶10.  Throughout the 1990s, plaintiff sourced most of its meat from vendors in the United States and did all the processing of its jerky in-house in Kent, Washington.  Dkt. #10 (Yonce Decl.) ¶3.  In 2000, plaintiff began considering whether to import meat products from Bertin Ltda, a company in Brazil that had access to large quantities of cattle and could provide plaintiff a good supply of raw meat.  Id. ¶¶3-4.  The Brazil beef prices and the lower cost of Brazilian labor also offered significant cost savings.  Id. ¶4.  Bertin had no prior experience in the natural-style jerky industry, did not manufacture jerky, did not employ persons knowledgeable in jerky manufacturing, and did not maintain all of the equipment and materials necessary to manufacture jerky.  Dkt. #11 (Firnhaber Decl.) ¶5.   In October 2001, plaintiff and Bertin entered into an exclusive manufacturing agreement (the "Agreement").  Dkt. #9 (Tull Decl.) ¶11.

Over the course of the business relationship, plaintiff provided Bertin with its proprietary product recipes, formulas and manufacturing processes.  Id. ¶¶12-14.  Bertin employees also learned a great deal about the development and production of jerky from plaintiff.  Id. ¶¶17-19.  Bertin and plaintiff worked together closely and Bertin allowed plaintiff to monitor the production process for each product in real-time.  Id. ¶¶20-21.  Since 2007, plaintiff has used a particular mix of equipment not known to the general public that allows jerky to be manufactured far more cheaply and efficiently.  Dkt. #11 (Firnhaber Decl.) ¶13.  Plaintiff claims that Bertin personnel are uniquely aware of this process, including the identity of the manufacturers from whom plaintiff sources the equipment used in the system.  Id. ¶14.  Beginning in 2008 through approximately October 2009, plaintiff and Bertin were partnering on another major research and development initiative for another new manufacturing process, which plaintiff considered highly confidential.  Id. ¶15.

In September 2009, defendant announced that it was acquiring Bertin.  Dkt. #6 (Ennis Decl.) ¶¶9-10; dkt. #29 (De Carvalho Decl.) ¶6.  Defendant claims to be the largest animal protein company and one of the largest beef producers and exporters in the world, with

ORDER GRANTING PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 2

operations in the United States, Brazil, Argentina, and Italy.  Dkt. #29 (De Carvalho Decl.) ¶3.

The merger of Bertin and defendant closed in December 2009.  Id. ¶6.  Defendant incorporated

Bertin's beef exporting and processing operations, which at the time were the second largest in

Latin America, including its facility in Lins, Brazil (the "Bertin Plant").  Id.  Defendant claims

that at the time of acquisition, plaintiff's beef jerky represented a small percentage of the Bertin

Plant's manufacturing, with the rest of the plant dedicated to Bertin's other products.  Id.  After

the acquisition, defendant and plaintiff discussed the Agreement and the reduction in plaintiff's

orders from the Bertin Plant.  Id. ¶¶15-16, 19-21.  By April 2010, the jerky facility at the Bertin

Plant had to be shut down because it could not be operated in an economically feasible manner.

Id. ¶23.  On April 30, 2010, defendant sent plaintiff written notice that it was terminating the

Agreement.[1]  Id.  On May 10, 2010, Plaintiff denied defendant's ability to terminate the

Agreement, denied that plaintiff had minimum purchase obligations under the Agreement, and

reminded defendant of its non-compete obligations under the Agreement.  Dkt. #6 (Ennis

Decl.) ¶¶19-20.  Plaintiff also placed an order on May 3, 2010 in an attempt to cure the alleged

breach.  Id. ¶18.  However, defendant was unable to fill the order due to an import ban from

Brazil to the United States, which remained in effect through December 2010.  Id. ¶21; dkt. #29

(De Carvalho Decl.) ¶¶26, 31.

In September 2010, defendant announced that it had plans to enter into a joint venture

with Jack Link.  Dkt. #29 (De Carvalho Decl.) ¶27.  Plaintiff claims that Link is its largest

United States competitor.  Dkt. #6 (Ennis Decl.) ¶22.  Pursuant to the joint venture, Link

transferred production from its beef jerky plant in Brazil to defendant's two Brazilian plants,

including the Bertin Plant.  Dkt. #29 (De Carvalho Decl.) ¶27.  Defendant claims that it now

only produces beef jerky as a partner in the joint venture.  Id.

---

[1]The parties dispute whether defendant informed plaintiff that it considered plaintiff's declining orders a breach of the Agreement.  Nevertheless, defendant has not provided any evidence that it provided written notice and opportunity to cure the alleged material breach prior to termination as required by the Agreement.

ORDER GRANTING PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 3

Plaintiff brought this motion because it anticipated that the U.S. export ban on Brazilian meat products would be lifted prior to an arbitrator's ability to resolve a preliminary injunction. The ban was lifted on December 28, 2010. Id. ¶31. Defendant claims that "it will take approximately one month for the [Bertin] Plant to resume operations and begin exporting again, with approximately another month required for those products to reach store shelves in the United States."[2] Id. On January 21, 2011, defendant served and filed a demand for arbitration. Dkt. #28 (Kafele Decl.) ¶3.

## III.   ANALYSIS

As a preliminary matter, defendant argues that the Court should deny the motion and defer to the arbitrators. However, the Ninth Circuit has held that "a district court may issue interim injunctive relief on arbitrable claims if interim relief is necessary to preserve the status quo and the meaningfulness of the arbitration process . . . ." Toyo Tire Holdings of Americas Inc. v. Cont'l Tire N. Am., Inc., 609 F.3d 975, 981 (9th Cir. 2010).

Here, plaintiff alleges that defendant has refused to perform under the Agreement and has entered into a joint venture with plaintiff's largest U.S. competitor. Plaintiff argues that the Court should grant injunctive relief to preserve the status quo by preventing defendant's use of its Brazil facilities to export meat snack products to the United States for Link's advantage until an arbitrator resolves this dispute. Dkt. #5 (Mot.) at 16-17. The Agreement specifically provides: "Each party will continue to perform this Agreement and fulfillment of Oberto's orders pending the final resolution of the Dispute." Dkt. #6 (Ennis Decl.) at 36, Ex. A, Agreement ¶23(b). The non-competition provision, which is discussed below, also purports to prevent defendant from selling, marketing or distributing jerky-products of plaintiff's competitors for five years after termination of the Agreement. Accordingly, the Court has authority to decide the motion on the merits.

---

[2]In oral argument, counsel stated for the first time that production would not begin until April 1, 2011, and that the meat snacks would not enter the U.S. market until late May or early June 2011.

ORDER GRANTING PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 4

A plaintiff seeking a preliminary injunction must establish (1) that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in his favor, and (4) that an injunction is in the public interest.  Toyo, 609 F.3d at 982.

### A.    Likelihood of Success on the Merits

Defendant argues that plaintiff is not likely to succeed on the merits because "(1) Oberto cannot enforce the non-compete clause because it constructively and wrongfully terminated and materially breached the Agreement; and (2) the clause is unenforceable because it is not reasonably tailored to protect a legitimate business interest."  Dkt. #25 (Opp.) at 12.

### 1.    Plaintiff's alleged breach of the Agreement

Defendant argues that plaintiff materially breached the Agreement by failing to purchase the minimum order obligations under paragraph 5 of the Agreement.

Paragraph 5 provides in relevant part:

> Beginning April 2002, Oberto agrees to order a minimum of 30% of agreed upon capacity as outlined in Section 3 provided the following conditions are met: 1) Manufacturer's transfer price is at an economic advantage when compared to Oberto's cost to produce the Products; and (2) Oberto is receiving orders that average a minimum of 40,000 pounds per week from Frito Lay North America.

Dkt. #6 (Ennis Decl.), Ex. A, Agreement ¶5.

A condition is an event that must occur, or a circumstance that must exist, in order for the promisor to have a duty to perform.  Colo. Structures, Inc. v. Ins. Co. of the W., 161 Wn. 2d 577, 588 (2007).  A condition is "precedent" if its occurrence triggers a duty of performance that had not arisen previously.  Id.  Here, the 40,000 pounds per week order from Frito-Lay was a condition precedent to Oberto's minimum order obligation.  If Frito-Lay did not place the minimum order, plaintiff had no obligation to place a minimum order with defendant. Defendant argues that plaintiff prevented performance of the condition by terminating the distribution agreement with Frito-Lay, thereby preventing Frito-Lay from placing orders.  Dkt.

ORDER GRANTING PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 5

#25 (Opp.) at 14. "It is a principle of fundamental justice that if a promisor is himself the cause of the failure of performance, either of an obligation due him or of a condition upon which his own liability depends, he cannot take advantage of the failure." <u>Refrigeration Eng'g Co. v. McKay</u>, 4 Wn. App. 963, 969-70 (1971) (citing 5 S. Williston, Contracts § 677 (3d ed. 1961 at 224)). The proper standard to review a promisor's failure to fulfill a condition precedent is good faith. <u>Tacoma Northpark, L.L.C. v. NW, L.L.C.</u>, 123 Wn. App. 73, 82 (2004). Plaintiff provides evidence that it was forced to terminate the contract because of Frito-Lay's refusal to perform and the rapidly declining sales which adversely affected both Oberto and Bertin. Dkt. #33 (Ennis 2d Decl.) ¶12. Plaintiff also provides evidence that Bertin fully supported the decision to terminate the Frito-Lay distribution agreement. <u>Id.</u> Presented with this undisputed evidence, the Court finds that it is likely that plaintiff acted in good faith to fulfill the condition and that plaintiff likely was not the cause of the failure to fulfill the condition.

Defendant also argues that plaintiff materially breached the Agreement by failing to adjust the price as required in the 2009 Addendum. The 2009 Addendum required the parties to reassess the product price if Oberto's orders decreased or increased below or above a certain level to adjust Bertin's fixed costs. Dkt. #29-1 (De Carvalho Decl.), Ex. 1, Agreement at 39-40. The Court questions whether failing to adjust the product price would be considered a material breach where the 2009 Addendum only required the parties to reassess the product price. Nevertheless, even if plaintiff did materially breach the Agreement, defendant has produced no evidence that it provided plaintiff the required written notice of breach with opportunity to cure prior to termination of the Agreement. Dkt. #6 (Ennis Decl.), Ex. 1, Agreement ¶¶10, 13. Accordingly, the Court finds that it is likely that plaintiff will demonstrate that it did not breach the Agreement.

### 2.   Enforceability of Non-Compete

Defendant argues that the non-compete provision is not enforceable because it unreasonably extends beyond protecting plaintiff's information. Dkt. #25 (Opp.) at 15.

In Washington, covenants not to compete are enforced to the extent they are reasonable and lawful. <u>Wood v. May</u>, 73 Wn. 2d 307, 312 (1968). In such circumstances,

ORDER GRANTING PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 6

"reasonableness" is a question of law.  Armstrong v. Taco Time Int'l, Inc., 30 Wn. App. 538, 543 (1981).  Under this rule, a court may modify the covenant even though the offending portion is grammatically indivisible from the remainder of the covenant.  Id.

Here, plaintiff specifically negotiated the non-compete provision as a condition to entering into the exclusive manufacturing agreement with Bertin.  Dkt. #10 (Yonce Decl.) ¶¶5-8.  The non-compete provision provides in relevant part:

> For the five (5) year period beginning after the termination of this Agreement, Manufacturer shall not, directly or indirectly (i) produce the Products[3] or similar products for any other party inside or outside the Territory,[4] (ii) sell, market or distribute the Products or similar products inside or outside the Territory; (iii) compete in any way with Oberto; and (iv) participate in or consult with any company which competes with Oberto inside or outside the Territory. . . .

Dkt. #6 (Ennis Decl.), Ex. A ¶18.  Plaintiff also negotiated a strict confidentiality agreement. Id. ¶16; Dkt. #10 (Yonce Decl.) ¶6.  Although plaintiff contends that the non-compete is enforceable as written,[5] it seeks a narrower, targeted preliminary injunction to prevent defendant's use of its two Brazil facilities, including the Bertin Plant, to export meat snack products to the United States for its competitor's advantage until an arbitrator resolves this dispute.[6]  Dkt. #5 (Mot.) at 16-17.

---

[3]For purposes of the contract, "Products" means "all meat snack products now or hereafter produced for Oberto and any 'natural style jerky' (in current parlance), now or hereafter produced for Oberto by Manufacturer and marketed under any trademark or tradename."  Dkt. #6 (Ennis Decl.), Ex. A ¶1(a)(i).

[4]For purposes of the contract, "Territory" means "the geographic area of the country of Brazil." Id. ¶1(c).

[5]The Court questions whether the non-compete is reasonable as written with respect to time, geography and scope.

[6]During oral argument, counsel for plaintiff conceded that the arbitration panel could independently decide whether a preliminary injunction is proper.

ORDER GRANTING PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 7

1    According to defendant's estimate, its competitive jerky-products could reach U.S.

2    shelves very soon. Dkt. #29 (De Carvalho Decl.) ¶31.  Plaintiff argues that by taking control of

3    its capacity at the Bertin Plant, defendant's joint venture with Link has made it more costly and

4    difficult, if not impossible to commit to large orders with valuable customers, or to take

5    advantage of Link's own prior inability to access supply.  Dkt. #33 (Ennis 2d Decl.) ¶16.

6    Plaintiff also argues that Link's joint venture with defendant provided Link with more supply,

     in direct violation of the non-compete, and forced plaintiff to compete against a stronger

7    competitor.[7] Id. ¶17.  Plaintiff also argues that the personnel at JBS/Bertin cannot simply

8    forget all of its proprietary information, including recent research and development

9    advancements, that plaintiff shared with them over the last decade.  Id. ¶18.  In response,

10   defendant claims that it will use its own or Link's processes and recipes, and argues that the

11   non-compete is unenforceable because it seeks to prevent fair competition.  Dkt. #25 (Opp.) at

12   18.  However, defendant does not address plaintiff's particular mix of equipment and most

13   recent research and development initiatives known to Bertin employees and that presumably

14   still exist in the Bertin Plant.  Dkt. #11 (Firnhaber Decl.) ¶¶13-15.

15       The Court finds the reasoning in Baker's Aid v. Hussmann Corp., 730 F. Supp. 1209

     (E.D.N.Y. 1990) instructive.  In Baker's Aid, the parties signed a manufacturing agreement in

16   which the manufacturer agreed to make ovens in accordance with the distributor's

17   specifications.  Id. at 1211.  The agreement contained a non-compete provision to prevent the

18   manufacturer from manufacturing, distributing, or selling ovens based on the distributor's

19   specifications.  Id. at 1213.  The non-compete also prohibited the manufacturer from making

20   and selling ovens anywhere in the United States or Canada.  Id.  The court upheld the covenant

21

22       [7]During oral argument, plaintiff presented the Court with a letter from Links to its valued
     customers in which it states in relevant part: "We have secured additional capacity through the
23   acquisition of the Mankato, Minnesota production facility and our recently announced joint venture
     with JBS.  In addition, we will continue to expand our future production capacity both domestically
24   and worldwide in order to support our aggressive growth targets."  The Court admitted the letter into
     evidence, over objection, and noted that defendant's objection went to the weight that should be given
25   the letter, rather than its admissibility.

26
     ORDER GRANTING PLAINTIFF'S MOTION FOR
     PRELIMINARY INJUNCTION - 8

to the extent that it prohibited the manufacturer from using the confidential specifications to make ovens. Id. at 1215. The court found that plaintiff had a legitimate business interest in proscribing the unfair competition that would result from defendants' use of the confidential specifications. Id. The court found the remainder of the non-compete unreasonable because plaintiff failed to show how banning defendants from the United States and Canadian rack oven markets is a narrowly tailored restraint necessary to protect a legitimate business interest. Id. at 1216. The court seemingly recognized the proper use of a non-competition agreement between businesses: "The agreement should be enforced if it helps promote economic activity (such as oven production resulting through the voluntary, permissive exchange of confidential information) but invalidated if its sole effect is to restrain trade (such as the emergence of competition resulting from the other party's independent hard work and efforts)." KW Plastics v. United States Can Co., 2000 U.S. Dist. LEXIS 15885, *42-43 (M.D. Ala. 2000).

Here, the non-compete provision was specifically negotiated and entered into by sophisticated parties. Bertin did not have an independent source of jerky-products prior to the Agreement. After the merger, defendant acquired all the rights and liabilities of Bertin, including the non-compete provision. RCW 23B.11.100. The Agreement expressly provides that it is assignable by Bertin to a successor by way of a merger or acquisition, and that the Agreement is binding on any such successor. Dkt. #6 (Ennis Decl.), Ex. A (Agreement) at 34 ¶17(ii). The Agreement also required performance of the Agreement until final resolution of the dispute by arbitration. Id. at 36, ¶23(b). Plaintiff has established that it has a legitimate interest in protecting its confidential information and in avoiding unfair competition with its major U.S. competitor. See Perry v. Moran, 109 Wn. 2d 691, 702 (1987) ("The essential purpose of the post-employment restraint . . . [is] to prevent competitive use, for a time, of information or relationships which pertain peculiarly to the employer and which the employee acquired in the course of the employment."); see also Volunteer Firemen's Ins. Servs., Inc. v. CIGNA Prop. & Cas. Ins. Agency, 693 A.2d 1330, 1338 (Pa. Super. Ct. 1997) (enforcing non-compete and recognizing plaintiff's vulnerability to competition from defendant due to defendant's knowledge of plaintiff's business methods and strategy). Plaintiff also has a

ORDER GRANTING PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 9

1    legitimate interest in preventing its competitor from taking a free ride on its substantial

2    investment in training Bertin employees and upgrading the Bertin Plant with equipment

3    plaintiff claims it developed through its confidential research and development.  See, e.g.,

4    Gemini Concerts, Inc. v Triple-A Baseball Club Assocs., 664 F. Supp. 24, 27 (D. Me. 1987);

5    Club Props., Inc. v. Atlanta Offices-Perimeter, Inc., 348 S.E.2d 919, 921 (Ga. Ct. App. 1986).

6         Unlike the plaintiff in Baker's Aid, here, plaintiff has shown that maintaining the status

7    quo until the arbitration panel has an opportunity to address the preliminary injunction is a

8    narrowly tailored restraint necessary to protect legitimate business interests.  The Court finds

     that a preliminary injunction prohibiting defendant's use of the Bertin Plant in Brazil to
9
     manufacture and export meat snack products to the United States for Link's benefit until the
10
     arbitration panel has an opportunity to address the preliminary injunction is reasonable.  The
11
     Court also finds that a preliminary injunction prohibiting defendant's use of plaintiff's
12
     confidential information in using its other Brazil plant to manufacture and export meat snack
13
     products to the United States for Link's benefit is reasonable.  This narrowly-tailored
14
     injunction imposes no greater burden on defendant than necessary to protect plaintiff's

15   legitimate business interests.[8]

16        Accordingly, the Court finds that plaintiff has demonstrated a likelihood of success on

     the merits.
17
          **B.    Irreparable Harm**
18
          Plaintiff argues that it will be irreparably harmed for several reasons:
19
               First JBS has eliminated Oberto's existing supply in Brazil, forcing
20             Oberto to seek an alternative source of supply of beef in Brazil and
               develop a plant there to manufacture the product to Oberto's
21             specifications for import, a process which could take several years.
               Second, and at the very same time, JBS intends to use its plants in
22             Brazil to provide competitive supply.  This means that at the same
               time that Oberto is disadvantaged by not having as much capacity
23             as it expected under the Agreement, JBS is turning around and

24   _____

25        [8]The Court notes that this preliminary injunction does not reach Link's ability to use its own
     facilities and distribution channels as it has done in the past.
26
     ORDER GRANTING PLAINTIFF'S MOTION FOR
     PRELIMINARY INJUNCTION - 10

> using that capacity against Oberto and advantaging its direct
> competitor: One that as a direct result of the breach will not be
> required to undertake the time-consuming, resource intensive work
> to develop a Brazilian source and establish supply.

Dkt. #5 (Mot.) at 23.  Plaintiff also argues that it will be irreparably harmed by defendant's ability to use a facility it helped build from the ground up, and by potentially using plaintiff's proprietary, confidential and trade secret information.  Id. at 22-23.  Defendant argues that plaintiff will not be irreparably harmed because defendant has not used, and will not use, any Oberto information.  Dkt. #25 (Opp.) at 19.  Defendant also argues plaintiff's loss of defendant as a supplier does not constitute irreparable harm because it can obtain an alternate source of supply, any loss associated with finding an alternate supplier is solely economic, and the injunction would not remedy this loss.  Id. at 20.  The Court disagrees.

Courts have found irreparable harm where defendant's breach of a non-compete provision causes loss of goodwill, loss of market share growth, and loss of business opportunity.  See Wyeth v. Natural Biologics, Inc., 395 F.3d 897, 902-03 (8th Cir. 2005); Freedom Holdings Inc. v. Spitzer, 408 F.3d 112, 114 (2d Cir. 2005); Register.com, Inc. v. Verio, Inc., 356 F.3d 393, 404 (2d Cir. 2004).  Additionally, defendant has not addressed the proprietary equipment and more recent research and development initiatives that presumably still exist in the Bertin Plant and within the knowledge of Bertin employees.

Accordingly, plaintiff has shown a likelihood of irreparable harm.

**C.    Balance of Equities**

The parties have presented evidence that only a portion of the Bertin Plant is used to produce meat snack products.  Defendant has also represented that no confidential information of plaintiff would be used in manufacturing meat snack products from its other Brazil facility. The injunction only prohibits defendant from using (1) the Bertin Plant to manufacture and export meat snack products to the United States for Link's benefit and (2) plaintiff's confidential information to operate defendant's other plant in Brazil to manufacture and export meat snack products to the United States for Link's benefit.  Defendant may wish that Bertin

had not entered into this exclusive manufacturing agreement with plaintiff.  However, enforcing contracts, including enforcing the non-competition, performance, and written notice with opportunity to cure provisions, tips the balance for this limited injunction in plaintiff's favor.

### D.    Public Interest

As previously discussed, this limited injunction is not meant to stifle fair competition.  It is required to protect plaintiff's legitimate interest in protecting its confidential information and in avoiding unfair competition with its major U.S. competitor.

## IV.   CONCLUSION

For all the foregoing reasons, the Court GRANTS plaintiff's motion for preliminary injunction and enjoins (1) defendant's use of the Bertin Plant to manufacture and export meat snack products to the United States for Link's benefit and (2) defendant's use of plaintiff's confidential information to operate defendant's other plant in Brazil to manufacture and export meat snack products to the United States for Link's benefit.  This Order will remain in effect until the arbitration panel has an opportunity to review plaintiff's request for injunctive relief or ultimately resolves the matter.  The parties dispute the amount of bond that would be proper "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The parties are ORDERED to provide the Court with additional briefing not to exceed five pages regarding the proper amount of this limited-duration bond by Wednesday, March 16, 2011.


DATED this 11th day of March, 2011.


Robert S. Lasnik
United States District Judge


ORDER GRANTING PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION - 12